

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

FREDERICK BRADLEY NOWELL, SR.,

        Movant/Defendant,

v.

    CASE NO.: _08 CV 23067_

    CV NO.:  08-23067-Civ-Martinez

    CR NO.:  07-20415-Cr-JEM

UNITED STATES OF AMERICA,

        Respondent,

_____/

## DEFENDANT FREDERICK BRADLEY NOWELL, SR.'S MOTION

## FOR RELIEF FROM A JUDGMENT PURSUANT TO

## FEDERAL RULES OF CIVIL PROCEDURE

## RULE 60 (b) (2), (3) AND (6)

**NOW COMES** the incarcerated Defendant, Frederick Bradley Nowell, Sr., (hereinafter NOWELL) pro se, and does move this Honorable Court for relief pursuant to Federal Rules of Civil Procedure 60 (b) (2), (3) and (6); and to convene an evidentiary hearing to determine all the facts in this matter; and in support Movant/Defendant NOWELL does state the follows:

1

## PRELIMINARY STATEMENT

NOWELL avers that he is not an attorney; has no legal or professional training pertaining to the preparation and filing of legal motions, memorandums, and appeals. NOWELL seeks notice of such limitations and prays this Court to construe his pleadings liberally in light of the Supreme Court holding in *Haines v. Kerner*, 404 U. S. 519 ( 1972 ); *Cruz v. Beto*, 205 U. S. 319 ( 1972 ); *Hill v. United States*, 368 U. S. 424, 430 ( 1962 ).

Further NOWELL avers that his herein motion for relief may be construed as a recharacterized motion or any other recharacterization deemed appropriate by the Court in accordance with *United States v. Jordan,* 915 F.2d 622, 624-25 as quoted in *O'Ryan Castro v. United States,* 290 F3d. 1270 (11ᵗʰ Cir. 2002) wherein:

> ". . . . courts have always had the power to recharacterize pro se petitioner's motions. In fact, due to the frequency in which pro se litigants draft incognizable motions, '[f]ederal courts have long recognized that they have an obligation to look behind the label of a motions filed by a pro se inmate and determine whether the motion is, in effect, cognizable under a different remedial statutory framework.' *United States v. Jordan,* 915 F.2d 622, 624-25 (11ᵗʰ Cir. 1990). The accommodation was the result of the time-honored practice of construing pro se plaintiffs' pleadings liberally. See *Haines v. Kerner*, 404 U. S. 519, 520, 92 S.Ct 594, 30 L.Ed.2d 652 (1972) (per curiam)."

[*O'Ryan Castro v. United States,* 290 F.3d 1270 (11ᵗʰ Cir 2002]

Based on *United States v. Jordan*, supra and *Haines v. Kerner,* supra, NOWELL

2

would ask that the Court construe his application for relief in the best light and most favorable characterization to this pro se litigant.

## RELEVANT STATEMENT OF THE CASE

The Redland Company, Inc. ("Redland") is an engineering construction company owned by Charles "Pinky" Munz ("Munz") (Cr-DE-13 ¶ 1 ). NOWELL was hired by Redland on or about September 1994 as an Administrative Vice-President with various duties, including the preparation of work estimates, the negotiation of contracts and subcontracts, and the approval of invoices and payments. (Cr-DE-13 ¶ 2 ). NOWELL was given signatory authority over Redland's operating account at Community Bank of Florida in Homestead, Florida on or about September 1999.  (Cr-DE-13 ¶ 3 ).

In or around October 1992 NOWELL established The Nowell Group, Inc., a Florida Corporation, of which he was the President.  NOWELL maintained a bank account at Bank of America, in the name of The Nowell Group, Inc., of which he was the signatory.   [It should be noted that this is some two (2) years prior to becoming employed by REDLAND.]

At the genesis of this case the FBI was conducting an investigation of Redland and on February 8, 2007, it executed a search warrant on NOWELL'S home.  ( Cr-

DE-24-1 ¶ 1 ).  Shortly thereafter NOWELL began meeting and conferring with representatives of law enforcement and the United States Attorney's Office concerning the search warrant and the underlying investigation. ( Cr-DE-24-1 ¶ 2 ). During those meetings, the Government alerted NOWELL that it was conducting an investigation into NOWELL'S employer, Redland, and its owner, Charles "Pinky" Munz. ( Cr-DE-24-1 ¶ 2 ).  The Government further advised the NOWELL that based upon its ongoing investigation, on allegations of Charles "Pinky" Munz, owner of The Redland Company, it believed NOWELL had defrauded Redland out of substantial amounts of money. ( Cr-DE-24-1 ¶ 2 ).

NOWELL always adamantly denied the Government's accusations that he ever received any monies that were not known of, and authorized by Mr. Munz. ( Cr-DE-24-1 ¶ 2 ).  From the very outset NOWELL explained that he and Munz had an agreement that included the payments and checks that the government later charged were the vehicle through which NOWELL was able to allegedly "embezzle" some $11.4 million dollars, (See Cv-DE-2, Exhibit Affidavit of Nowell, attached hereto as Appendix Item #1.)

There are several very important facts that need to be established in order to understand this case: ( 1 ) NOWELL and Mr. Munz maintained an agreement from about mid-1995 to his termination in which NOWELL would receive a modest salary

4

and would further receive regular draws as payments toward his primary income which was to be 8% - 10% of Redland's gross revenue adjusted annually; ( 2 ) the additional income would be paid to Petitioner's personal corporation; ( 3 ) the payments would reflect on Redland's records as payments to vendors charged off as job costs, sub-contractors and suppliers; ( 4 ) this arrangement was supposed to be kept confidential from Redland's regular personnel. ( Cr-DE-18 ¶ 6 ) and ( Cr-DE-24 ¶ 11 ) and (Cv-DE-20).

These facts are central to this case because they deal directly with the payments that are being charged against the Movant as the vehicle of embezzlement. There are 173 checks totaling $11,540,657.69. Of these one check is made payable to Yacht Equipment and Parts for $24,203.41 and one payable to Welling Construction for $148,884.42. The remaining 171 checks are all payable to NGI Marine which is NOWELL'S business. It has also been stipulated in a related civil case that check numbers 63 for $49,695.80 and number 85 for $49,860.90 were both undisputed loans from Redland to NOWELL that were repaid in full and were deducted from the original alleged loss amount after the government became aware of them. The inclusion of the Yacht Equipment and Welling Construction checks in the case makes the Information incorrect. The charging Information states that all the "illegal" checks were deposited into NGI's bank account. These checks were not; making the information incorrect and further showing counsel's and government's

5

misrepresentations. There is also the inclusion of the 23 checks signed by Munz in the charging information which again makes the information incorrect. [Munz, Munz's civil attorney and Munz's accountant all testified in the related civil case that Munz never signed any checks to NGI Marine, See Cv-DE-29, Hearing Transcript].

Of these 171 checks payable to NGI Marine, the first 23 checks to NGI Marine were signed by Charles P. Munz with the exception of one check which was signed by his wife Mrs. Terry Munz. These checks signed by Mr. and Mrs. Munz total $1,129,664.17. These are referred throughout all of NOWELL'S pleadings as the Munz signed checks.

When NOWELL first learned the specifics of the accusations against him he immediately began requesting that his attorney obtain copies of all the checks that he was being accused of Mr. Nowell knew the Munz signed checks had existed because obviously NOWELL knew he was being paid before being able to sign checks so obviously those checks had to exist.

It was remarkable to NOWELL that no one had the checks or at least no one admitted having the checks. The prosecutor, Ms. Silverstein, advised defense counsel, E. Ross Zimmerman, that there were no checks signed by Mr. Munz, further NOWELL signed all the checks himself. If this statement is **not true** then one of two things had to be true; ( 1 ) AUSA Silverstein lied to Zimmerman thus suppressed evidence in violation of *Brady* ; or ( 2 ) That Zimmerman never asked for

evidence thus gross ineffectiveness of Counsel. The F. B. I. Agent Maria Lockwood told NOWELL in the presence of NOWELL'S wife that all the checks were written by NOWELL and that Munz had no knowledge. Here, if this statement **is true** then Agent Lockwood lied to NOWELL as the existence of 23 checks signed by Munz has now been established, ( Cv-DE-18-7 ), and were with Agent Lockwood during search of Defendant's residence on February 8, 2007, [See Cr-DE-35, Hearing Transcript, Page 8, Line 8 thru 10]. In the civil case Munz testified he had never heard of NGI Marine until this case found it. He testified he never authorized any payments to it. At the hearings in the civil case Redland attorney McGuinness advised the Court that Munz had not signed "a single check" to NGI Marine. Redland's accountant Christi Sharp testified that all the checks had NOWELL'S signature on the back of the check (the endorsement), and testified that Mr. Munz did not sign any of the checks. [ It should be noted that the checks are endorsed by a handwritten "NGI Marine" with the account number and they do not have any signature on the back. ] It has been clearly established that Munz signed at least 23 checks to NGI Marine so it is just as clear that misrepresentations were made and perjury was committed. [ See Government's reply to 2255 Motion ( Cv-DE-18-7 ) and ( Cr-DE-18 and 24 ) Exhibits. ]

These facts are the truth and the evidence of this truth has been submitted to the Broward County Circuit Court, the United States District Court for the Southern

District of Florida, the United States Court of Appeals for the Eleventh Circuit, and the Supreme Court of the United States and yet despite all of these presentations no one has commented on this most important evidence.

After being coerced, lied to, and threatened into a plea of guilty; the **evidence surface** on August 17, 2007, nearly 2 months **after** NOWELL'S Change of Plea, of June 21, 2007, was entered, and 18 days **before** NOWELL'S Motion to Withdraw Guilty Plea based on "fair and just reason" argument. That is just as NOWELL told everyone; just as various affidavits from friends and associates forebear (Cv-DE-24, Exhibits);   NOWELL was truthful. (It should also be noted that from the date when the Munz signed checks became **"available"** to the Defendant till his Motion to Withdraw Guilty Plea was 18 days; During this 18 days Defendant was asking Attorney Zimmerman to withdraw the plea which he refused to do. )

On September 4, 2007, NOWELL filed his pro se Motion To Withdraw Previously Entered Guilty Plea, (Cr-DE-18): And on September 6, 2007, Judge Martinez denied NOWELL'S motion to withdraw his guilty plea.[1]

---

[1]     NOWELL'S motion to withdraw his guilty plea, (Cr-DE-18), pursuant to Fed. R. Criminal P. 11(b)(2)(B) presented more than sufficient evidence that there was a **fair and just** reason to withdraw his plea: (1) checks signed by Munz, (2) no discovery by Defense Counsel; (3) perjury on the part of the alleged victim Munz concerning this very matter during and evidentiary hearing in the related civil case.
          Judge Martinez chose to ignore the factual evidence presented and instead ruled that NOWELL was only trying to delay his sentencing. (See hearing transcript of September 6 and 11, 2007.)

8

On September 11, 2007, Judge Martinez again denied NOWELL'S Motion To Withdraw Guilty Plea filed by defense counsel on September 7, 2007. (Cr-DE-24).[2]

Through counsel, NOWELL appealed the denial of his Motion To Withdraw Guilty Plea; Appellant's Counsel based appeal on only one issue, abuse of discression, failing to argue the issues instructed by NOWELL.

NOWELL'S appeal was denied on February 28, 2008; Writ of Certiorari was subsequently denied on October 21, 2008; and a 28 U. S. C. § 2255 Motion To Vacate was filed on November 3, 2008 (Cv-DE-1 and Cv-DE-2).

On March 23, 2010 an Order was entered adopting Magistrate Judge's Report and Recommendation and denial of NOWELL'S 28 U. S. C. § 2255 Motion, (Cv-DE-70); NOWELL filed an appeal on March 29, 2010 and on April 1, 2010 an Order was entered by Judge Martinez denying a Certificate of Appealabilty, (Cv-DE-74).

On April 27, 2010 Movant/Defendant NOWELL'S Application For Certificate of Appealabilty was filed with the Eleventh Circuit Court of Appeals; and on July 2, 2010, the Circuit Court denied NOWELL'S Application For Certificate of Appealabilty. On July 19, 2010, NOWELL filed for an Enlargement of Time in which to file a Motion For Reconsideration and a request for clarification of points of Law for the denial of COA.

---

[2]        See Footnote 1, page 8.

Having no response from Circuit Court on Motion For Enlargement of Time, Nowell filed his expedited Motion For Re-consideration; There was an error in the mailing of the Motion For Reconsideration and a subsequent mailing was done on August 4, 2010.

NOWELL filed a CORRECTED/AMENDED Motion For Reconsideration which the clerk returned stating that it was construed as a successive filing of a Reconsideration Motion and was returned unfiled and not considered by the Court.

On August 31, 2010, The Circuit Court entered a denial of NOWELL's Motion For Reconsideration.

Previously, on May 17, 2010, NOWELL filed a motion for Disqualification of Assistant United States Attorney, Joan Silverstein, (Cv-DE-81); District Court Judge Martinez denied said motion on May 18, 2010 ruling that motion was "moot", (Cv-DE-82).

On June 7, 2010, NOWELL filed a motion for an Order To Show Cause Why AUSA Should Not be Held in Criminal Contempt for failing to obey a lawful Court Order of Standing Discovery, (Cv-DE-83); District Court Judge Martinez denied said motion on June 9, 2010 ruling that movant did not meet his burden that a show cause order was warranted, (Cv-DE-84).

On June 21, 2010, NOWELL filed a motion, (Cv-DE-86), to Amend/Correct order denying Order To Show Cause, (Cv-DE-84), pursuant to Fed. R. Civ. P. 52(b);

10

and again Judge Martinez denied said motion ruling that there was no manifest error of law or fact, (Cv-DE-87).

On June 28, 2010 NOWELL filed a Notice Of Appeal, (Cv-DE-88), appealing Judge Martinez's denial of Cv-DE-81, Cv-DE-83, and Cv-DE-86; and on July 7, 2010 Judge Martinez denied NOWELL a Certificate of Appealabilty, (Cv-DE-91); Appeals Court later ruled that a Certificate of Appealabilty was not required to appeal the denial of the aforementioned Motions; Appeal has been fully briefed and is before the Court for disposition.

On October 28, 2010 NOWELL filed a Writ of Certiorari with the Clerk's Office of the United States Supreme Court concerning the denial of Certificate of Appealabilty of the denial of his 28 U.S.C. § 2255 Motion; On November 29, 2010 Certiorari was denied;  This Rule 60 (b) Motion then ensued.

## 60 (b) (2), (3) AND (6) ISSUES

Defendant NOWELL alleges, states, and believes that the issues to be determined in this instant action so as to enable the Court to determine cause for justifiable relief are as follows:

(1)    **60 (b)(2) Newly discovered evidence favorable to defendant's defense:**

(a)    Newly discovered evidence of perjury by Government's

11

essential and key witness, Mr. Charles P. Munz, in a related civil action wherein Government's essential and key witness committed perjury that directly related to and affected the course and out come of this case; (b) Newly discovered evidence that alleged victim, Munz, was aware of NGI Marine and checks to NGI Marine in 2002 and 2003 based on accounting notes, (see Cv-DE-31 Appendix Item #2); (c) The secret body tape of NOWELL and Munz that was withheld until January 23, 2009 wherein NOWELL clearly states that nothing was "stolen"; (d) And the FBI Report of interviews of defendant that were only discovered when they were used  as "Exhibits"  to  Government's Response, (Cv-DE-20), to  NOWELL'S § 2255 Motion in January of 2009.

Where there may be a question of time limitation in raising newly discovered evidence issue, Rule 60 (b) (2), the real issue here is **justifiable relief**.  Under any standard for justifiable relief the issue of new evidence must be given greater weight toward correcting an injustice than in any limitation set by time when the denial of the evidence is not caused by the defendant; See *Butts v. Curtis Publ'g Co,* (1964, ND Ga) 242 F. Supp 390; *Prostrilli v. University of South Dakota*, (1974 DC SD) 63 FRD 9, 18 FR Serv 2d 1977: "Phrase 'newly-

discovered evidence' refers to evidence of facts in existence at time of trial of which aggrieved party was excusably ignorant." [See also *Henry v. Hess Oil V.I. Corp.,* (1965, DC VI) 33 VI 163, 163 FRD 237, 43 Fed. Rules Evid Serv. 358];   In this respect and in this case all newly discovered evidence should be considered under both Rule 60 (b) (2) and (6) due to the extraordinary circumstances wherein the Government withheld evidence from the defendant causing a defect in the integrity of the federal habeas corpus proceedings. (See *Gonzalez v. Crosby, infra).*

(2)      **60 (b)(3) Prosecutor committed fraud in violating requirements of *Brady* and the Court Ordered Standing Discovery Order:**

Assistant United States Attorney, Joan Silverstein, the Prosecutor in this case, did withhold evidence due to the defense pursuant to Fed. R. Crim. P., Local Rules, (Standing Discover Order), and numerous rulings of the United States Supreme Court such as *Brady, Kyles,* and most recently, *Cone v. Bell,* (07-114, Argued 12/9/ 2008).

Had NOWELL had this withheld evidence and information he would not have plead guilty.  There is now sufficient information and evidence in the record that with such information and evidence and the

cumulative effect of all the now known evidence NOWELL would have gone to trial and would have easily shown his actual innocence to a jury.

A Rule 60 (b)(3) motion must establish (1) that the adverse party engaged in fraud or other misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting his case. Rule 60(b)(3) is aimed at judgments which were **unfairly obtained**, not at those which are factually incorrect.

The action/inaction of the AUSA, Silverstein is fraud and was committed willfully against this opposing party, and the Court causing defect in the integrity of the habeas corpus proceedings. (See *Gonzalez v. Crosby,* infra).

(3)     **60 (b)(6) Prosecutional misconduct in the violation of 18 U. S. C. § 401 (2) and (3):**

The Prosecutor in this case, Assistant United States Attorney, Joan Silverstein, did withhold, suppress and deny favorable evidence to the defense and in so doing violated a lawful Court Order of Standing Discovery, (see Cr-DE-6, Appendix Item #3, and Cv-DE-83, Appendix Item #4).

Application of Rule 60 (b) (6) must be confined to truly

14

extraordinary and exceptional cases, see *Davidson v. Dixon,* 386 F. Supp. 482 (1974 DE Del.).  See *Gonzalez v. Crosby,* 545 U.S. 524 162 L. Ed. 2d 480, 125 S. Ct. 2641 which the following was found in part:

> "Breyer, J., concurring, expressed the view that, as the Supreme Court had explained, a proper Rule 60 (b) motion attack, not the substance of a federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas corpus proceedings."

The indisputable factual evidence that Government Prosecutor violated 18 U. S. C. § 401 (2) and (3) squarely puts this case in the extraordinary and exceptional category wherein the Prosecutor is in violation of the law; and to compound the extraordinary and exceptional nature of this violation of the law, the violation was also a violation of a Court's order. If the Prosecutor for the Government is not going to follow, not only the laws, but then disregard a lawful Court's order, then there can be no justice or integrity in the habeas corpus proceeding. (See *Gonzalez v. Crosby,* supra).

(4)     **60 (b)(6) Prosecutional misconduct in the violation of 28 U. S. C. § 528:**

Prosecutor's failure to disqualify herself in this case due to both personal and financial conflict of interest, (see Cv-DE-81 Appendix Item 5).

15

The application of Rule 60 (b) (6) requiring extraordinary and exceptional circumstances, see *Davidson v. Dixon,* supra, and *Gonzalez v. Crosby,* supra is created when a Government Prosecutor teams-up with the alleged victim and the Prosecutor's own relative (spouse), for personal and financial gain. Prosecutors are suppose to act in an adversarial manner in the prosecution of a criminal case without receiving any personal gain or financial gain through the Prosecutor's relationship with an alleged victim and her own spouse and the law firm said spouse is a member of. When this type of relationship occurs, then the extraordinary and exceptional conflict of interest occurs. Justice cannot occur where conflicts of interest are present, and causing a defect in the integrity of the habeas corpus proceedings. (See *Gonzalez v. Crosby,* supra).

**(5)    60 (b)(6) Actual Innocence:**

> " . . . , to meet the actual innocence standard, a habeas petitioner must show that 'in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.' Id. (Internal quotation marks and citation omitted). Furthermore, to make a sufficient showing actual innocence, the petitioner must produce 'new reliable evidence - - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - - that was **not presented at trial.**" *Arthur v. Allen,* 452 F.3d 1234, 1245 (11ᵗʰ Cir. 2006) (quoting *Schlup v. Delo,* 513 U. S. 298, 324, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). [Emphasis Added]

In the Court's consideration of NOWELL'S actual innocence claim, the Court must consider that all the withheld evidence that was due to defendant by way of *Brady* and other case law and the Standing Discovery Order of June 5, 2007 is in fact <u>newly-discovered</u> since this evidence was available only after June 21, 2007 Change of Plea by the Defendant.

The record is now clear that had NOWELL had the evidence that is now newly discovered he would have gone to trial and easily have shown his actual innocence by way of the new evidence.

Proof of NOWELL'S actual innocence is in the new evidence of Munz actually signing checks that total over a Million Dollars and would convince any juror that Munz knew of the compensation plan for NOWELL and he could not continue to claim "no knowledge" of such a payment plan for NOWELL; The new evidence would clearly show that Munz was asked about these payments to NOWELL by the Accountant back in 2002 and 2003 (Cv-DE-31), (Appendix Item #2), during the annual Redland Company's audits; there is the secret tape that shows that NOWELL clearly stated that "nothing was stolen" during his conversation that was being recorded by the Government; Then there is the evidence of the perjury that was committed by Munz,

the Redland Company Accountant, and even Munz's Civil Attorney, Lynette McGuinness, concerning the matter of Munz's signature on over a Million Dollars of the checks to NOWELL.

Considering all the above, there is no question that a jury would not have convicted NOWELL of any wrong doings. If the Government had been made themselves aware of the true motive of the dealings between NOWELL and Munz during their investigation proceedings of this case, NOWELL's actual innocence of his suspected wrong doings would have prevented him from being charged with the crime alleged in his Information.

## **BASIS OF RELIEF**

Under Federal Rules of Civil Procedure, Rule 60 Relief from a Judgment or Order;

subsection (b) states:

"On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons:

As to part (2) it states:

"newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59 (b);

As to part (3) it states:

> "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."

And as to (6) it states:

> "any other reason that justifies relief."

NOWELL alleges, states, and believes that AUSA Silverstein, the Prosecutor in this case, did violate 18 U. S. C. § 401 (2) and (3); did violate 28 U. S. C. § 528; and further withheld evidence from the defendant causing a defect in the integrity of the habeas corpus proceedings; and defendant's claim of actual innocence causing the relief under Rule 60 (b) (2), (3) and (6) to be reasonable and justifiable relief, (See *Gonzalez v. Crosby,* 545 U. S. 524).

Further, as to "due diligence" in discovering new evidence it was found in *United States v. Walus,* 616 F.2d 283, 303-04 (7ᵗʰ Cir. 1980) (relief available under Fed. R. Civ. P. 60(b)(2) provision for "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)" because defendant did not previously know about witnesses despite extensive search for proof of innocence.) Additionally or alternatively, doctrines that have been developed in the habeas corpus context may be viewed as sufficiently similar in nature and purpose to the new "due diligence" standard to shed light on that standard. See, e.g., *Dobbs v. Zant,* 506 U. S. 357, 358 (1993) (per curiam) (court of appeals

should have permitted habeas corpus petitioner to supplement record on appeal with transcript that bore upon claim of ineffectiveness of counsel because counsel's delay in obtaining transcript "resulted substantially from the State's own erroneous assertions that closing arguments had not been transcribed"); *McCleskey v. Zant,* 499 U. S. 467, 496 (1991) (unavailability of evidence may be basis for showing **"cause"** and thus for avoiding state's defenses of procedural default and (pre-Act) writ abuse, as long as unavailability is judged according to "the principle that petitioner must conduct a reasonable and diligent investigation" (emphasis added)). For efforts to flesh out AEDPA's "due diligence" standard, see, e.g., *Moore v. Knight,* 368 F. 3d 936, 940 (7th Cir. 2004) ("a due diligence inquiry should take into account that prisoners are limited by their physical confinement"); *Roberts v. Dretke,* 356 F. 3d 632, 638-39 (5th Cir. 2004) (section 2254(e)(2)(A)(ii)'s "due diligence" requirement was satisfied because counsel did not discover until after state postconviction proceeding that affidavit filed by attorney whose effectiveness was challenged "was a virtual carbon copy of an affidavit that the attorney had submitted in a different case"; "engaging in the time and labor intensive task of investigating the records of unrelated cases for evidence that, in almost all instances, will bear no relevant, much less useful, evidence is beyond the requirements of due diligence"); *Aron v. United States,* 291 F.3d 708, 711-15 (11th Cir. 2002) ("[d]ue diligence . . .does not require a

prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts. Moreover, the due diligence inquiry is an individualized one that 'must take into account the conditions of confinement and the reality of the prison system'"; "a petitioner's failure to exercise due diligence before AEDPA was enacted cannot support a finding that a petition fails to satisfy the timeliness requirement of [AEDPA's statute of limitations]"; prisoner's phone calls and letters to counsel and submissions to court, seeking to learn contents of appellate brief filed on prisoner's behalf, "clearly reflect[] a diligent response to AEDPA's enactment"; foregoing allegations of due diligence were sufficient to justify evidentiary hearing, and district court erred in denying hearing, given "that allegations are not affirmatively contradicted by the record and the claims are not patently frivolous"; district court's "due diligence" determination "is a legal characterization," reviewable on appeal "for clear error") *Montenegro v. United States,* 248 F.3d 585, 591, 592-93 (7th Cir. 2001), overruled in part on other grounds, *Ashley v. United States,* 266 F.3d 671, 674-75 (7th Cir. 2001)(prisoner's "lack of sophistication could become part of a due diligence analysis because the limitations with which a prisoner is faced might influence how quickly facts could have been discovered", district court's assessment of "due diligence" is reviewed on appeal for "clear error," not "abuse of discretion"; "Nothing in the language implies discretion

21

committed to the trial judge. Rather, it involves a finding of fact – whether due diligence was exercised –followed by a determination that the factual scenario satisfies the strict confines in the statute."); *Bush v. Singletary,* 99 F.3d 373, 375 (11th Cir. 1996); *Frazier v. Rogerson,* 248 F. Supp. 2d 825, 833 (N.D. Iowa 2003) ("The phrase 'due diligence' is not defined anywhere in the AEDPA, but should be considered in light of the totality of the circumstances present including a petitioner's confinement in prison and any special restrictions that incarceration may impose ... In construing and applying this phrase, courts appear to require that the petitioner show some kind of measure of prudence, activities or assiduity as may be properly expected from and ordinarily exercised by a reasonable and prudent person under the particular circumstances present."). See also *Drew v. Department of Corr.,* 297 F.3d 1278, 1287 (11th Cir. 2002), cert. Denied, 537 U.S. 1237 (2003) ("the determination of whether a party was diligent is a finding of fact, subject to review for clear error").

Also *Gonzalez v. Crosby,* 545 U. S. 524 Copyright Cases or Patent Cases (2005), the Court considered whether a motion for relief from final judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, filed by a habeas corpus petitioner "[a]fter the federal courts denied petitioner habeas coprus relief from his state conviction, ... [is] subject to the additional restrictions that apply to 'second of successive' habeas corpus petitions under the provisions of the Antiterrorism and

22

Effective death Penalty Act of 1996 (AEDPA) codified at 28 U. S. C. § 2244(b)." Id. at 526 Copyright Cases or Patent Cases. The *en banc* 11th Circuit and several other lower courts had held that a Rule 60(b) motion filed under these circumstances – and that, "indeed, any postjudgment motion under Rule 60(b) save one alleging fraud on the court under Rule 60(b)(3)[–] ... was in substance a second or successive habeas corpus petition" and thus was subject to AEDPA's restrictive procedures and standards for petitions of this sort (id. at 528 Copyright Cases or Patent Cases; The Court **"unanimous[ly] reject[ed]...** the view that all postjudgment motions under Federal Rule of Civil Procedure 60(b) except those alleging fraud under Rule 60(b)(3) should be treated as second or successive habeas corpus petitions" (id. at 539 Copyright Cases or Patent Cases (Stevens J., dissenting)) and definitively declared that "Rule 60(b) has an unquestionably valid role to play in habeas cases" (id. at 534 Copyright Cases or Patent Cases (majority opinion)). The Court made clear that a Rule 60 motion such as the one filed in *Gonzalez*, which "attacks, not the substance of the federal court's resolution of a claim on the merits, **but some defect in the integrity of the federal habeas proceedings,"** "is not to be treated as a successive habeas petition." Id. at 532, 538 Copyright Cases or Patent Cases (majority opinion). The Court explained that "we give little weight" to the state's "appeal to the virtues of finality," given that the provision to the interpreted, Rule 60(b), is one "whose

23

whole purpose is to make an exception to finality." Id. at 529 Copyright Cases or Patent Cases.

And, see *Gonzalez v. Crosby*, 545 U. S. 524 Copyright Cases or Patent Cases, 528 Copyright Cases or Patent Cases (2005)("Rule 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances including fraud, mistake, and newly discovered evidence."). See also *Willis v. Jones,* 2009 U. S. App. LEXIS 10578, at *16-*17 (6th Cir. May 15, 2009) (when reviewing pro se litigant's Rule 60(b) motion to determine which subsection of Rule 60(b) applies, courts must apply general rule that "pro se filings are 'to be liberally construed'".

## ARGUMENT IN SUPPORT OF RELIEF

**(1)   Newly Discovered Evidence Favorable To Defendant's Defense:**

Defendant NOWELL alleges, states, and believes that newly discovered evidence has become available to the defendant's defense that had such evidence been available prior to June 21, 2007, NOWELL would have not participated in a change of plea negotiation nor participated in a change of plea proceedings on June 21, 2007, but would have proceeded to trial, and established his actual innocence before a jury. The availability of the newly discovered  evidence would have most

24

assuredly changed the out come of the proceedings in this case.

For the district court to grant relief based upon newly discovered evidence under Fed. R. Civ. P. 60 (b) (2), moving party must satisfy five-part test; (1) evidence must be newly discovered since trial, (in this instant case prior to change of plea); (2) due diligence on part of movant to discover new evidence must be shown; (3) evidence must not be merely cumulative or impeaching; (4) evidence must be material, and (5) evidence must be such that new trial would probably produce new result. Motion for a new trial under Rule 60 (b) (2) is extraordinary motion requirements of rule must be strictly met. See *Gundotra v. United States Dept't of the IRS,* (2005, CA 11 Fla.) 160 Fed Appx 834.

From the beginning of this case back on February 8, 2007, the Defendant NOWELL has stated to many persons, (See affidavits attached as Exhibits to Cv-DE-24, Attached hereto as Appendix Item #5), that if he could find and possess the checks that the alleged victim, Charles P. Munz, signed that were payable to NGI Marine, those checks being part of the alleged unauthorized payments to the defendant, that with these checks he would go to trial and prove his innocence.

Defendant NOWELL, himself, and through counsel, diligently pursued the location and the possession of the checks signed by Munz. NOWELL was told by FBI Agent Maria Lockwood that she had no checks signed by Munz during her

questioning of NOWELL on February 8, 2007 at his residence during the serving of a search warrant, when in fact the record shows that Agent Lockwood did have checks signed by Munz at the time and place of the search on February 8, 2007. (See Hearing Transcripts Cr-DE-35, page 8, lines 8 - 10.) The alleged victim, Charles P. Munz, Munz's civil attorney Lynette E. McGuinness, and Munz's Accountant, Christi Sharp, testified and made statements that were perjurious and caused NOWELL to believe that checks signed by Munz did not exist any longer, (see Civil Case No. 07-003164 CACE 12 Hearing Transcript, Cv-DE-29). Defendant NOWELL'S Attorney, E. Ross Zimmerman, advised NOWELL that he could not obtain the checks or copies of the checks Munz signed since the checks were more than seven (7) years old, (see Cv-DE-18 & 20 Exhibit letter of Zimmerman's).

It has now been determined that twenty-two (22) checks signed by Munz and one (1) check signed by Munz's wife, Terry L. Munz, did exist and was in the possession of Munz's civil attorney, Lynette McGuinness, on March 19, 2007, during the evidentiary hearing in the related civil case; and further, that the AUSA Silverstein also possessed the checks signed by the Munzs at that same time.

During the time from February 8, 2007 while the criminal investigation was ongoing; during the time when plea negotiations were ongoing; and during the time that Defendant NOWELL entered a change of plea on June 21, 2007 all parties denied

the existence or the availability of the Munz signed checks. [3]

There is further newly discovered evidence that would have persuaded NOWELL to go to trial and not be coerced into pleading guilty to prevent any prosecution or involvement of his wife and step-son; that additional evidence being as follows:

(i)    Secret Body Tape by FBI concerning a conversation between Munz and NOWELL on February 8, 2007. NOWELL clearly states that nothing was stolen in his conversation on this tape, (see Cv-DE-18 & 20 Exhibit). It should be noted that the existence of this tape was not revealed to Defendant NOWELL until January 23, 2009, almost two (2) years later, well after NOWELL'S change of plea, sentencing and incarceration. See *United States v. Noe,* 821 F.2d 604, 607 (11th Cir. 1987) and *United States v. Rodrigues,* 799 F.2d 649, 654 (11th Cir. 1986) (non-disclosure of documents was reversible error because the defendant did not have an opportunity to prepare to meet the evidence.)

_____

[3]

It should be noted that between February 8, 2007 and June 21, 2007, NOWELL was charged on June 5, 2007 at which time a Standing Discovery Order was issued. The Standing Discovery Order was never accomplished, and furthered the denial of the existence of the Munz signed checks.

(ii)    Evidence of Munz's knowledge of payments to NGI Marine in 2002 and 2003, (see Cv-DE-31), wherein Munz's Accountant Sharp discussed the payments to NOWELL with Munz on at least (2) separate occasions.

(iii)   Evidence of Munz's perjury in the related civil case proven by the evidence of the existence of the checks signed by Munz and the evidence of the accounting notes, (see Cv-DE-31, exhibits).

Defendant NOWELL alleges, states and believes that the newly discovered evidence herein stated and described, and further considering the "**cumulative effect**" of said evidence is more than sufficient cause to believe that had this evidence been available to NOWELL that the outcome (results) of the proceedings would have been different. Simply put, Defendant NOWELL would have had sufficient evidence to persuade him to go to trial and show his actual innocence if said evidence had not been withheld, hidden, and not made unavailable to him. [See *Schlup,* 513 U.S. 298, 328] Further, with the evidence described herein, Defendant NOWELL could not have been lied to, coerced, manipulated, and threaten into changing his not guilty plea to a guilty plea in order to prevent the threaten prosecution of his family members.

This Court has already made a **cumulative materiality analysis** concerning withheld evidence, see *Ward v. Hall,* 592 F.3d 1144 (11th Cir. 2010), wherein the

28

Court stated:

> "Cumulative analysis of the force and effect of the undisclosed pieces of favorable evidence matters because the sum of the part almost invariably will be greater than any individual part. Whether the sum of the **withheld evidence** favorable to the defense will be enough to create a reasonable probability that the jury would have acquitted will depend on two factors. One factor is that net inculpatory weight of the evidence on both sides that actually was presented at trial" [In this case it would be the evidence due pursuant to the Standing Discovery Order]. "The other factor is the aggregate effect that the **withheld evidence** would have had if it had been disclosed. These two factors are brought to bear at the crucial second step of the materiality process, which begins with putting on the scales the evidence that was presented at trial - evidence favoring the prosecution on one side, that favoring the defense on the other. Then the force and effect of all of the undisclosed exculpatory evidence is added to the weight of the evidence on the defense side, while the force and effect of all the undisclosed impeachment evidence is subtracted from the weight of the evidence on the prosecution's side. Once the evidence on the scales is adjusted to take into account the combined force and effect of the undisclosed evidence favorable to the defense, the standard that is applied is not one of sufficiency of evidence to convict. It is instead whether what is left on both sides of the scales after adjusting for the **withheld evidence** creates a reasonable probability that a jury would acquit, and a reasonable probability is one sufficient to undermine our confidence in the guilty verdict." *Smith v. Sec'y for the Dep"t of Corr.*, 572 F.3d 1327, 1347 (11th Cir. 2009). [Emphasis Added]

Based on this analysis, NOWELL would not have participated in any plea negotiations; would not have entered a plea agreement; but would have gone to trial and shown his actual innocence. Further, it must be clearly understood that the Government **withheld evidence**, (Failed to accomplish requirements of Standing Discovery Order of June 5, 2007), thereby making all evidence to be considered withheld and newly discovered evidence.

For the reasons and evidence described herein NOWELL seeks relief by way of the vacating of his conviction and be granted a trial on the Government's charges in this case due to the absence of integrity in the habeas corpus proceedings.

### (2)  **Prosecutor committed fraud in violating _Brady_ and Court ordered Standing Discovery Order:**

The Prosecutor in this case, Assistant United States Attorney, Joan Silverstein, did withhold, suppress, and deny favorable evidence to defense; In _United States v. Avellinio,_ 136 F. 3d 249 (2ⁿᵈ Cir. 1998) it states:

> [2]  "Information that must be disclosed by government under _Brady_ includes not only evidence that is exculpatory, in that it goes to heart of defendant's guilt or innocence, but also evidence that is useful for impeachment, in that it has potential to alter jury's assessment of credibility of significant prosecution witness."

Had Defendant NOWELL had the information that was known to the government concerning the alleged victim's perjury in the related civil case, he would have gone to trial and shown Munz to be a liar and could have easily impeached him. [It should be noted that Munz is the **only** government witness to the alleged theft.]

> [3]  "Government's obligation to disclose material evidence to accused is pertinent not only to accused's preparation for trial but also to his determination of whether or not to plead guilty; defendant is entitled to make that decision with full awareness of favorable material evidence known to government."

30

Had Defendant NOWELL had the information that was known to the government the **cumulative effect** of such evidence would have caused NOWELL to go to trial.

> [4]   "Although guilty plea is generally considered valid so long as plea was intelligently and voluntary, validity of plea must be reassessed if it resulted from impermissible conduct by state agents, including *Brady* violation."

Here again had NOWELL had the information and evidence known to the government he would never had entered a plea of guilty.

In action for new trial under misconduct prong of Rule 60 (b)(3), based on failure to disclose or produce materials requested in discovery, movant must show opponent's misconduct substantially interfered with its ability fully and fairly to prepare for and proceed at trial. *Anderson v. Cryovac, Inc.* (1988, CA1 Mass) 862 F.2d 910, 28 Envt Rep. Cas 1622, 12 FR Serv 3d 719 (criticized in *Jordan v. Paccar, Inc.* (1996 CA6 Ohio) 1996 US App LEXIS 25338) and (criticized in *Loyd v. Rubin* (1999, ND Tex) 1999 US Dist LEXIS 19436).

Further, a discovery violation under Rule 16 (a)(1)(A) or a **Standing Discovery Order** is reversible error only when it violates a defendant's substantial rights. See *United States v. Rivera,* 944 F.2d 1563, 1566 (11th Cir. 1991); *United States v. Silien,* 825 F.2d 320, 323 (11th Cir. 1987); *United States v. Barragan,* 793 F.2d 1255, 1259 (11th Cir. 1986).  Substantial prejudice exist when a defendant is unduly surprised and **lacks an adequate opportunity to prepare a defense**; See

*United States v. Noe,* supra and *United States v. Rodrigues,* supra.

Had NOWELL had the use of the evidence due to him to determine whether he should have plead guilty or go to trial, NOWELL would have surely gone to trial; The cumulative effect of all the withheld evidence would have been more than sufficient to achieve a showing of actual innocense. (See NOWELL's Affidavit of May 8, 2008, Appendix Item #1, ¶ 52 to ¶ 66.)

Under Fed. R. Civ. P. 60 (b)(3), both intentional and unintentional misrepresentations and failures to disclose are sufficient basis for relief, as well as party's failure to truthfully respond to discovery requests, see *Schreiber Foods, Inc. V. Beatrice Cheese, Inc.,* (2004, ED Wis) 305 F. Supp 2d 939 affd in part an rvd in part on other grounds, remanded (2005, CA FC) 402 F. 3d 1198, 74 USPQ2d 1204, 61 FR Ser 3d 174.

Further, setting aside judgment under Rule 60(b)(3) for withholding of material does not require that material withheld be sufficient to alter District Court's judgment, *Square Constr. Co. v. Washington Metropolitan Area Transit Authority,* (1981, CA4 Va) F.2d 765 (criticized in *Jordan v. Baccar, Inc.* (1966, CA6 Ohio) 1996 US App LEXIS 25358).

Prosecutor's withholding of evidence and then when confronted with such simply stated at NOWELL's Sentencing Hearing, (Cr-DE-27), that the evidence of checks signed by Munz, the alleged victim, were **"irrelevant"**, and willfully and

purposefully made no mention of the many other items due to defendant under the Standing Discovery Order, is clear showing of **impermissible conduct** by AUSA Silverstein.

This conduct by the Prosecutor, Joan Silverstein, causing a defect in the integrity of the habeas corpus proceedings, (See *Gonzalez v. Crosby,* supra), warrants the vacating of NOWELL's conviction, pursuant to NOWELL's guilty plea agreement, and this matter be set for a trial by jury; or the court's reassessment of the Motion pursuant to 28 U. S. C § 2255.

### (3)     **Prosecutional misconduct in violation of 18 U. S. C. 401 (2) and (3):**

On June 5, 2007, Defendant NOWELL appeared before Magistrate Judge Rea M. Simonton at which time NOWELL entered a plea of **not guilty** to a charge by Information of one count of mail fraud. Upon entering of the not guilty plea by NOWELL'S Counsel, E. Ross Zimmerman, Magistrate Judge Simonton issued a Standing Discovery Order executed and signed on June 5, 2007, and clearly indicating that discovery was to be accomplished with fourteen (14) days from the date of the order. As of this date of this herein filing no discovery has been presented by the AUSA Joan Silverstein nor the United States Attorney Office of the Southern District of Florida, Miami Division to Defendant NOWELL.

Under 18 U. S. C. § 401 (2) and (3) it states:

"A Court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as - -

33

(1)    Misbehavior of any person in its presents or so near thereto as to obstruct the administration of justice;

(2)    Misbehavior of any of its officers in their official transactions;

(3)    Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

Defendant NOWELL alleges, states, and believes that AUSA Silverstein did violate 18 U. S. C. § 401 (2) and (3), (See Cv-DE-83 and NOWELL's Affidavit to Cv-DE-83, (attached hereto as Appendix Item #4). In *Irving Trust Co. v. Spruce Apartments, Inc.,* it states:

"Person having actual knowledge of existence of order or decree of court was liable for violating it, . . ."

[*Irving Trust Co. v. Spruce Apartments, Inc.,* 42 F. 2d 218 (DC Pa. 1930)]

In *United States v. Jones,* a case where allegations of material exculpatory information being withheld by prosecutor it was found:

"In criminal contempt proceedings against Government prosecutors based on their alleged failure to provide defendants with all material exculpatory information, in violation of the Local Rules and court orders, if it is proven beyond a reasonable doubt that (1) there was a lawful court order of reasonable specificity, (2) the prosecutor violated it and (3) the violation was willful, the prosecutor will have been proven guilty of criminal contempt. 18 U. S. C. § 401;"

[*United States v. Jones,* 620 F. Supp. 163 (D Mass. 2009)]

[See also; *United States v. Stevens,* Cr. No. 08-231 (EGS), 2009 WL 839337 (D. D. C. Apr. 1, 2009); *United States v. Shaygan,* No. 08-201120CR, WL 980289 (S. D. Fla., Apr. 9, 2009)]

The record in this case clearly shows that at no time was **any evidence** in the

34

possession of the Government or that the Government had knowledge of or should have had knowledge of was provided to the defendant or his defense counsel in this case. This undisputable fact of the Government's failure to provide discovery prescribed by law and rule is a direct violation of 18 U. S. C. § 401 (2), "Misbehavior of any of its officers in their official transactions;" and further the Government's failure to obey a lawful Standing Discovery Order within the prescribed time set by said order is a direct violation of 18 U. S. C. § 401 (3), "Disobedience or resistance to its lawful writ, process, order, rule, decree or command."

For the Government's Prosecutor's violation of 18 U. S. C. § 401 (2) and (3) as shown and described herein causing a defect in the integrity of the habeas corpus proceeding, (See *Gonzalez v. Crosby,* supra). NOWELL seeks relief by way of the vacating of his conviction pursuant to NOWELL's plea agreement, and be granted a trial on the Government's charges in this case; or the court's reassessment of the Motion Pursuant to 28 U. S. C. § 2255.

### (4) Prosecutional misconduct in violation of 28 U. S. C. §528:

The genesis of this case began on February 8, 2007 when the defendant had a search warrant served on him at his residence. From that date until the present time AUSA Joan Silverstein had been the lead and only Government Prosecutor in this case.

At some point in the early stages of this case's investigation by the Government

35

and its agencies, the alleged victim, Charles P. Munz, retained the law firm of

Akerman Senterfitt, Attorney at Law, One Southeast Third Avenue, 25th Floor,

Miami, Florida 33131-1714, (see Cv-DE-81). It was discovered just prior to the

filing of Cv-DE-81 that the spouse of AUSA Joan Silverstein was a member of the

Akerman Senterfitt law firm and that was indeed the same law firm that was

representing Charles P. Munz and The Redland Company, Inc. in a violation action

concerning building permits with the Miami-Dade County Building Department.

This matter with the building department is one that involved NOWELL and as such

caused a conflict with the prosecution of this case.  This relationship between

NOWELL, Munz, Government's Prosecutor, Joan Silverstein , and the representation

by Silverstein's husband's law firm of Munz is fully described in NOWELL'S filing

of a Motion For The Disqualification Of Assistant United States Attorney, Cv-DE-81.

During the investigation, plea negotiations, sentencing, and filing of

NOWELL'S 28 U. S. C. § 2255 Motion To Vacate, AUSA Silverstein has been the

lead and sole prosecutor in this matter and as such has a personal and financial

conflict of interest in direct violation of 28 U. S. C. § 528.

Under 28 U. S. C. § 528, Disqualification of officers and employees of the

Department of Justice: it states:

> "The Attorney General shall promulgate rules and regulations which require
> the disqualification of any officer of employee of the Department of Justice,
> including a United States Attorney or a member of such attorney's staff, from
> participation in a particular investigation or prosecution if such participation

may result in a personal, financial, or political conflict of interest, or the appearance thereof. Such rules and regulations may provide that a willful violation of any provision thereof shall result in removal from office."

Defendant NOWELL alleges, states, and believes that Assistant United States Attorney, Joan Silverstein did willfully violate 28 U. S. C. § 528, (see Cv-DE-81). The ordinary remedy in a criminal case where it is established that the prosecuting attorney conducting or assisting in the trial had a personal interest is **a reversal of the conviction or the granting of a new trial**. Dismissal of a post-conviction petition without an evidentiary hearing would be error. [See *Young v. State,* 177 So. 2d, 345 (Fla. Dist. Ct. App. 2d Dist. 1965) and *People v. Dyer,* 28 Ill. App. 3d 436, 328 N. E. 2d 716 (5th Dist. 1975)]

For the Government's Prosecutor's violation of 28 U. S. C. § 528 as shown and described herein causing a defect in the integrity of the habeas corpus proceedings, (See *Gonzalez v. Crosby,* supra), NOWELL seeks relief by way of the vacating of his conviction and be granted a trial on the Government's charges in this case.

### (5)   Actual Innocence Claim:

This **"actual innocence"** claim is based upon the arguments in this herein Rule 60 (b) Motion, as well as all records and files to the instant case to include any and all evidence that may be submitted to this Honorable Court.

The movant's claim of actual innocense in this motion is substantiated in the record. A habeas petitioner attempting to establish **"actual innocence"** must meet

a high standard. *Bousley v. United States,* 523 U. S. 614, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998). He must demonstrate that "in light of all the evidence, 'it is more likely than not that no reasonable juror would have convicted him.'" *Bousley,* supra at 623, quoting, *Schlup v. Delo,* 513 U. S. 298, 327-328, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). The Court emphasized that actual innocence means factual innocence, not mere legal insufficiency. Id. See also *High v. Head,* 209 F. 3d 1257 (11th Cir. 2000); *Lee v. Kemna,* 213 F. 3d 1037, 1039 (8th Cir. 2000); *Lucidore v. New York State Div. of Parole,* 209 F. 3d 107 (2nd Cir. 2000) (citing *Schlup v. Delo,* 513 U. S. 298, 299, 115 S. Ct. 851, 130 L. Ed. 2d 808, (1995); *Jones v. United States,* 153 F. 3d 1305 (11th Cir. 1998)(Holding that appellant must establish that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him).

To be credible, a claim of actual innocense requires the petitioner to "support his allegations of constitutional error with new reliable evidence - - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - - that was not presented at trial." *Schlup v. Delo,* 513 U. S. at 324. All things considered, the evidence must undermine the Court's confidence in the outcome of the trial. Id. at 316. [See NOWELL'S argument concerning analysis of evidence starting with last paragraph on page 28 of this herein 60(b) motion.]

In *Schlup,* supra, the Supreme Court set forth the standard of proof governing

a habeas petitioner's procedural claim of actual innocence: the petitioner must show

that constitutional error "probably resulted" in the conviction of one who is actually

innocent. 513 U. S. at 326-27. Further:

> "a substantial claim that constitutional error has caused
> the conviction of an innocent person is extremely rare. To be
> credible, such a claim requires [a] petitioner to support his
> allegations of constitutional error with new reliable evidence -
> - whether it be exculpatory scientific evidence, trustworthy
> eyewitness accounts or critical physical evidence  - that was
> not presented at trial." Id. (citation omitted).

The *Schlup*  Court went on to make several observations about this standard.

With respect to the term "probably resulted," the Court clarified that, "[t]o establish

the requisite probability, the petitioner must show that it is **more likely than not** that

no reasonable juror would have convicted him in light of the new evidence," 513 U.

S. at 327, 330 (emphasis added). With respect to the term "reasonable juror," the

Court instructed: "It must be presumed that such a juror would consider fairly all of

the evidence presented.  It must also be presumed that such a juror would

conscientiously obey the instructions of the trial court requiring proof beyond

reasonable doubt." Id. at 329. Additionally, it is important to note in this regard that

actual innocence means factual innocence, not mere legal insufficiency. See *Bousley*

*v. United States,* 523 U. S. 614, 623-24, 118 S. Ct. 1604, 1611-12, 140 L. Ed. 2d 828

(1998) (citing *Sawyer v. Whitley,* 505 U. S. 333, 339, 112 S. Ct. 2514, 2518-19, 120

39

L. Ed. 2d 269 (1992)).

In assessing the adequacy of the petitioners showing, the district court "is not bound by the rules of admissibility that would govern at trial." *Schlup,* 513 U. S. at 329. Instead, the court is allowed also to consider "the probative force of relevant evidence . . .' including that alleged to have illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been **wrongly excluded** or to have become **available only after the trial.**'" Id., 513 U. S. at 328 (quoting Friendly, <u>Is Innocense Irrelevant? Collateral Attack on Criminal Judgments,</u> 38 U. Chi. L. Rev. 142, 160 (1970). [Emphasis Added]

When the Court considers the evidence in NOWELL'S case, the Court must consider all the evidence as "newly discovered" based on the fact that the evidence **was wrongly excluded,** (See *Schlup* at 328), in this case withheld evidence to make a **knowing** decision to **not** enter a plea agreement, but would used the new evidence in a not guilty plea and go to trial. [See NOWELL'S argument concerning analysis of evidence starting with last paragraph on page 28 of this herein 60(b) motion.]

For NOWELL to show the Court that the evidence would show "actual innocence", the Court need only to review what is now part of the record along with evidence that would surely come in or substantiate already known evidence showing NOWELL'S actual innocense.

In an analysis of the evidence one must first consider that NOWELL has always asserted his innocence even in light of his guilty plea agreement, (See NOWELL'S Affidavit, Appendix Item #1). NOWELL has asserted from the beginning that Munz's allegations were false and were brought about due to motives outside any alleged theft of Redland funds. To substantiate the assertions by NOWELL of the false allegations by Munz, one need only to look at two substantial and overwhelming facts: (1) Munz alleges that he had no knowledge of any payments to NOWELL, but yet there are over a million dollars in payments to NOWELL, (23 Munz signed checks), that show that Munz did have knowledge and by signing the checks, there was a showing of authorization; there is evidence that the Redland Company's Accountant discussed these payments to NOWELL with Munz back in 2002 and 2003 while Accountant was doing the annual financial audit on Redland Company's finances, (See Cv-DE-31); (2) And the most compelling fact is that Munz, Munz's Civil Attorney, and Munz's Accountant lied, (committed perjury), during an Evidentiary Hearing in a related civil case wherein all three said that Munz never signed any checks to NOWELL, ("not a single one"), and that NOWELL signed all the checks involved in this matter which now is clearly shown by evidence as being false and untrue.

Based just on the issues of the 23 checks signed by Munz and then the lies and

41

perjury about the signing of the checks by Munz would convince any reasonable juror
that more probably than not NOWELL is innocent and that there was no crime at all.
Couple this evidence concerning the signatures on over a million dollars worth of
checks with the other "accumulative evidence" such as the secret tape recording
where NOWELL stated that there was "nothing stolen", the evidence that Munz we
aware of the payments to NOWELL back in 2002 and 2003, and the other evidence
of Munz's untruthful and perjurious testimony in the civil case, all which was
withheld from NOWELL prior to his change of plea hearing on June 21, 2007, is a
clear showing that "no reasonable juror would have convicted him." (See *Schlup,* 513
U. S. at 327). [See NOWELL'S argument concerning analysis of evidence starting
with last paragraph on page 28 of this herein 60(b) motion.]

Based on NOWELL's claim of actual innocence, and given the substantial
showing that in light of all the evidence NOWELL's conviction by means of an
unknowing and involuntary plea agreement should be vacated and NOWELL be
allowed to enter a plea of not guilty as he did on June 5, 2007, and then be tried by
a jury for any charged the Government may feel appropriate.

## CONCLUSION

It has been the Defendant's contention from the very beginning of this case that
he was actually innocent of any wrong doings. Defendant NOWELL has stated many

42

times that with the evidence that he knew existed at one time that he would go to trial. This statement has been collaborated by several affidavits given by persons who NOWELL spoke to all during the initial investigation of this case by the Government and are part of the record of this case. The affidavits are not just from people who NOWELL may have had a casual relationship with, but are people who are very aware of his character, and two of these affidavits are from sworn law enforcement officers in the South Florida Community, (Attached hereto as Appendix Item 6).

Without the evidence of Munz's knowledge of the additional compensation plan for NOWELL by The Redland Company, and the threats by the Government that unless NOWELL entered a guilty plea, the Government would charge his wife and step-son in this matter also, this caused NOWELL to be manipulated into a plea agreement. Evidence of this coercion is clearly shown in the record of this case and is clearly indicated by the alleged victim Munz's civil action against NOWELL, his wife and his step-son concerning these very same events and circumstance as in this criminal case. Defendant NOWELL would never allow his family to be harmed by any criminal involvement in this matter and succumbed to the Government's threats to obtain a guilty plea.

Although Defendant NOWELL knew that he was not guilty of any wrong doing, once he made the decision to go down the path of a guilty plea agreement he was told/advised by his attorney that he must stay on the path or he would not be able

43

to convince the Court to accept his plea agreement. If the Court would not accept his plea agreement then his family would again become involved. This he could not let happen, and for a time all went well and as planned until NOWELL found what he was looking for and needed; checks to NGI Marine signed by Charles P. Munz, the alleged victim in this case, and finding out that his defense attorney never investigated nor obtained discovery in this case.

Once the evidence of the checks came out and Defendant NOWELL realized that his own attorney had never investigated or received discovery NOWELL immediately attempted to change his plea again by having his attorney file a motion to withdraw previously entered guilty plea pursuant to Fed. R. Crim. P. 11 (d) (2) (B); NOWELL'S attorney refused to file a motion to withdraw the plea; NOWELL filed his pro se motion on September 4, 2007, (Cr-DE-18). The District Court denied NOWELL'S motion mainly due to him being represented by counsel so his pro se filing was determined to be improper; NOWELL'S attorney upon instructions from the Court filed a subsequent motion that was later determined to be nearly identical except for any reference as to defense attorney not obtaining any discovery; The Court also denied this motion, (Cr-DE-24). The events from this point on are in the record of this matter, and now bring this matter to this instant filing of a motion for relief under Rule 60(b).

Clearly it is now evident that events took place, or in some cases did not take

place, that brings us to this juncture; First, did AUSA withhold evidence and then before the Court misrepresented it as "**irrelevant**", and failed to mention any other evidence she knew of or possessed? The answer is clearly yes;  Secondly, did AUSA Joan Silverstein have a conflict of interest in this case in violation of 28 U. S. C. § 528? The answer is clearly yes;  Third, did AUSA Joan Silverstein disobey a lawful court order in violation of 18 U. S. C. § 401 (3)? The answer is clearly yes; Next, did AUSA Joan Silverstein withhold exculpatory evidence from the defendant in this case in violation of 18 U. S. C. § 401 (3)? The answer is clearly yes;  If the answer to any **single one** of these questions is **"yes"**, thereby confirming that a defect in the habeas corpus proceeding did occur, then NOWELL is due relief under Rule 60 (b).

Further, the acceptance of any of the herein described "**newly discovered evidence**" as being available to Defendant NOWELL only after the Court's acceptance of his guilty plea, based on a plea agreement, the Defendant NOWELL is due relief under Rule 60(b) (2) and (6).

## NATURE OF RELIEF SOUGHT

Based on the evidence now on the record of this case, NOWELL has shown a proven claim of **actual and factual innocense**.  He therefore requests this Court provide relief in the form of vacating his conviction and sentence.

If this Court feels NOWELL has provided an initial claim of **actual innocence**

based on facts that can be in part still unperfected a request for an evidentiary hearing would be proper.  In fact, the Supreme Court has held under certain circumstances involving a defendant's guilty plea, as NOWELL has done herein, that the Petitioner would be entitled to hearing on the merits of the motion, despite the Petitioner's failure to contest the guilty plea based on **actual innocence** on direct appeal.  Again, this is exactly what NOWELL has done.  See *Bousley v. United States,* 523 U.S. 140 L. Ed. 2d (1998).

Further, based on the many defects in the integrity of the habeas corpus proceeding, shown herein, NOWELL request the vacatur of the denial of his petition for writ of habeas corpus.

NOW THEREFORE if the Court can not bring an Order to vacate NOWELL'S sentence and conviction, nor the vacatur of the denial of NOWELL'S 28 U. S. C. § 2255 Motion at this point in the proceeding, NOWELL request and deserves an evidentiary hearing on the merits of this 60(b) Motion.

Respectfully submitted,

Frederick Bradley Nowell, Sr.
Movant/Defendant, pro se
#79553-004, Anteaus Unit
Federal Medical Center
P. O. Box 14500
Lexington, KY 40512

46

## CERTIFICATE OF SERVICE

I, Frederick Bradley Nowell, Sr., hereby certify that a true copy of the forgoing was mail to the parties shown on the <u>SERVICE LIST</u> below on this //<sup>th</sup> day of April, 2011, by depositing in the U. S. Mail, postage prepaid.

Frederick Bradley Nowell, Sr.

## SERVICE LIST

Lisa Tobin Rubio, Esq.
Assistant United States Attorney
United States Attorney's Office
5th Floor
99 N. E. 4th Street
Miami, Florida 33132

# **APPENDIX**

Appendix Item #1:     NOWELL'S Affidavit of May 8, 2008, Exhibit to Cv-DE-2.

Appendix Item #2:     Petitioner's Motion For Leave To Amend By Supplement Petitioner's Motion Pursuant to 28 U.S. C. § 2255 To Include Newly Discovered Evidence Which Evidence Directly Bears On The Actual Innocence Of The Petitioner

Appendix Item #3:     Standing Discovery Order

Appendix Item #4:     Motion Show Cause Why Prosecutor Should Not Be Held In Criminal Contempt Of This Court

Appendix Item #5:     Motion For The Disqualification Of Assistant United States Attorney

Appendix Item #6:     Movant's Reply To Government's Answer To Motion To Vacate, Set Aside, or Correct Sentence Pursuant to 28 U. S. C. § 2255, (Cv-DE-24), Exhibits)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

|  |  |  |
|---|---|---|
| FREDERICK BRADLEY NOWELL, Sr., | ) | |
| | ) | |
| Petitioner/Defendant, | ) | CV No.: _____ |
| | ) | CR No.: 07-20415-CR-JEM |
| v. | ) | |
| | ) | Hon. Jose E. Martinez |
| UNITED STATES OF AMERICA, | ) | U.S. District Judge |
| | ) | |
| Petitioner, | ) | |
| | ) | |

## SWORN DECLARATION OF DEFENDANT

### FREDERICK BRADLEY NOWELL, Sr.

STATE OF KENTUCKY)
                                    )
COUNTY OF FAYETTE)

I, FREDERICK BRADLEY NOWELL, Sr., (hereinafter referred to as the Defendant), do hereby swear, declare, and state as follows:

1.      The Defendant was employed with the Redland Company, Inc., (hereinafter referred to as "Redland"), on or about September 14, 1994, as Administrative Vice-President for Redland.

2.      Defendant's duties were to organize and manage the day to day operations of Redland including, but not limited to, supervision of office and some aspects of the field operations of Redland.

## APPENDIX ITEM #1

1

3.      After several months of performing the original duty items, the Defendant and Redland's owner, Charles Pinky Munz, (hereinafter referred to as "Munz"), discussed the scope of Defendant's original employment duties in relation to what was actually being performed by the Defendant and it was determined that the scope of duties and responsibilities had greatly increased and Munz wanted the Defendant to do even more.

4.      In or around early to mid-1994 the Defendant and Munz met and discussed the following:

      a.      That Defendant would be responsible for the complete operation of all day-to-day activities of all aspects of the administration of five entities to wit:

           1.      The Redland Company, Inc.

           2.      Redland Construction Company, Inc.

           3.      Country Flying, Inc.

           4.      Redland Park of Commerce

           5.      Redland Rock

      b.      That for each of the above entities the Defendant would oversee all aspects of:   accounting, payroll, insurance, taxes, data processing, equipment financing, bank credit lines, review and approval of invoices and job costs.

c.     Defendant needed to prepare estimates, take offs, pricing, preparation of bid documents, attend bid openings and other related bidding functions.

d.     Defendant was to prepare contracts to be executed by clients and review client contracts to be executed by Redland.

e.     Defendant was to be responsible for the duties of a construction project manager, attend and chair all pre-construction meetings for new contracts and attend and hold regularly scheduled job meetings during the course of each project.

f.     Defendant was to be responsible for all change orders, request for change orders, request for information, monthly billing documents, both preparation and collection of same.

g.     Defendant was responsible for all annual reporting requirements for each entity listed in a. 1-5 above, including occupational licenses, contractors licenses, property taxes, annual reports, responses to all governmental agencies.

5.     During a meeting in late 1995 Munz proposed that he, in addition to Defendant's salary, pay the Defendant a percentage of the gross sales of Redland as compensation for the greatly increased duties and responsibilities that Defendant was to

undertake.   Munz proposed Defendant would receive 8-10% of gross sales.   This arrangement had several mutually agreed conditions:

      a.    No other employee of Redland was to be told or in any way have any knowledge of the payment arrangement between Redland and the Defendant.

      b.    That Defendant was to be paid through a company that the Defendant had established in 1992 known as NGI Marine, a fictitious named company of the Nowell Group, Inc.

      c.    Payments were to be distributed over several vendors so as to conceal multiple payments to one entity, NGI Marine.

      d.    That payments to NGI Marine were to be done on a monthly basis calculated on the gross sales either known or anticipated at that time for Redland.

      e.    That payments to NGI Marine were to be charged to multiple vendors doing work as a subcontractor or supplier for Redland.

      f.    That payments to NGI Marine were to be shown as job costs for the selected vendor so as to spread the cost of the Defendant's additional compensation over all the jobs going on at the time of payment.

    6.    During Munz's and Defendant's meeting, and shortly thereafter, a method was devised wherein Defendant would:

a.   Enter invoices on a payable to a selected vendor by simply generating an invoice based on past invoices or newly generated invoices.

b.   Vendor would be paid by a Redland check generated and printed in accounting department check printer.

c.   When the checks were to be presented, a "post-it" note would be placed over the payee section of the negotiable check. The check was then printed on a track feed impact printer. All information would be printed on the post it note, but would also register on the copies.

d.   The Defendant would then remove the post-it from the real check, separate it from the copies and type NGI Marine on the payee section. The check would then be ready for signature.

e.   The first 23 of these checks, over approximately the first couple of years, were signed by Charles Pinky Munz. Thereafter, the checks were signed by the Defendant.

7.   It was also decided, at the direction of Munz, in a mid-1995 meeting and shortly thereafter, that the bank statement would have to be changed to reflect the Vendor's name on the cancelled check in lieu of NGI Marine, (which had been typed thereon). This was accomplished by a simple cut and paste process and the bank statement page was recopied and placed in the bank statement file.

5

8.    The purpose and underlying reasons for the method of payment to NGI
Marine was for the following reasons:

      a.    No one was to know or be aware of the additional
compensation for fear that it may cause conflicts with other
Redland employees.

      b.    By making payments to NGI Marine in this manner there
would be no payroll taxes, matching FICA taxes or
unemployment taxes to be paid by Redland on the
Defendant's compensation.

      c.    By making payments in this manner, instead of paying it as
Defendant's salary, the Worker's Compensation would not
be affected, thus keeping premiums to a much lower
premium calculation.

      d.    These payments to NGI Marine, also, would not affect any
other insurance premiums that would be based on total
payroll of Redland.

      d.    By paying NGI Marine, all payments would be a direct job
cost, thereby reducing income tax liability for Redland.

9.    Payment started mid-1995 thru October 5, 2006.  Defendant signed the
first check September 15, 1999.  All checks had full knowledge of Munz.  See also ¶ 43.

10.    When Defendant began to work for Redland, Munz had already had an
established practice of paying employees "off the payroll."  The term, "off the payroll,"

meant that an employee is paid additional compensation that is not added to his payroll. The reason for this is to save the taxes and premiums described in ¶ 8 §§ a – e, supra. The employee is actually paid out of the "operating account" and the expenditure is charged as an "expense reimbursement" to the employee. Munz had already established and authorized expense checks to several employees prior to September 1994, the date of Defendant's employment.

11.    Redland had a policy and procedure that employees turn in an Expense Summary listing all expenses to be reimbursed, with attachments of receipts for all such expenses. These are legitimate expenses to be reimbursed; however, in Redland's system, additional compensation is also shown on the expense form, but no receipts are attached because no real expenses ever existed. This practice began with some 5 – 6 employees in 1994 or before, and by 2006 there was a list of over 30 employees that received additional compensation on a monthly basis.

12.    Redland has been sued for this problem with payroll in U.S. District Court, Southern District of Florida, *Odely v. Redland*, Munz, Case No.: 07-21760.

13.    The business entity, Country Flying, (owned exclusively by Munz), owns and operates two airplanes. Munz's common practice and procedure was to expense all costs for maintenance and operation of the aircraft to a job cost or to aircraft expense. These two planes were never used for any type of company business. The planes were used to fly to "Foul Cay" an island in the Bahamas which was leased by Munz; or they were used on hunting trips in various parts of the country. This was just another way to reduce corporate profit for Munz's personal use.

14.    Mr. Munz's established policy and procedure was to add to and improve the facilities of Foul Cay Island by purchasing all materials, equipment, and supplies for Foul Cay projects and charging them as a job cost of Redland.  Also, there were times when a Redland crew of people would be carried to Foul Cay to be used in said improvement projects at the expense of Redland and all charged off as job costs.

15.    The policy of writing off as job cost the activities in ¶¶ 13 and 14 was improper and illegal to the extent that these funds should have been considered distribution of profits from Redland to Munz as personal income and then said expenses paid directly by Munz with after tax dollars.

16.    In the course of Defendant's employment he was responsible for the coordination with attorneys in any civil litigation involving Redland, (and to a degree, Munz).  This requirement caused the Defendant to be aware of practically all of Redland's dealings.

17.    At some point in time the Defendant became aware that Munz violated the permit conditions of the Miami-Dade County Department of Environmental Resources Management ("DERM") by:

        a.    Hauling excavated material from a lake excavation known as "Homestead Pit" to a location outside the permitted area. Redland was sued by Florida Rock and Sand/ACI because the act of violating DERM Permit also violated the conditions of an agreement between Redland and Florida Rock and Sand (ACI).  This suit is still pending.

b.    Over-excavating Homestead Pit by almost 30 feet, which caused DERM to issue a cease and desist order – later fining Redland $550,000.00 for their violation. Somehow, Munz convinced DERM to allow him to pay the fine at no interest and a payment of $25,000.00 per month for 22 months.

18.    The City of Homestead has terminated an agreement granting Redland a license to excavate the Homestead Pit due to the over-excavation; falsifying as-built documents for permit renewal; and civil theft from the over-excavating and subsequent selling of the excess material.

19.    Munz has numerous permit violations with Miami-Dade County Building Department for construction of office additions to Redland's facilities at 23799 SW 167th Avenue, Homestead, FL 33031. Due to violations of the building and zoning codes Munz was required to move Redland to another location. He has appealed this action to the Building Department. During the Building Department's investigation of these matters, Munz lied several times about the use of this property in question. This is well documented in the records of said matter.

20.    There is, or was, an investigation by the FBI into Munz's activities and dealings with the City of Homestead and more particularly what involvement Munz had in any bidding irregularities that had arisen concerning the purchase of certain land by Munz from an individual and then Munz's resell to the City of Homestead. These questions are:

a. How did Munz learn that this particular piece of land was the only site on which the City of Homestead could effectively build a needed electrical substation?

b. How was he able to make $200,000.00 to $250,000.00 on this property by selling it to the city?

c. Was there any relationship between this land transaction and a "LOAN" that was made to a City Building Official who knew the City needed a very specific piece of property which Munz suddenly bought for no apparent reason?

21. Shortly after this criminal case against the Defendant started, the Government contended the Defendant was responsible for $11,540,657.69. At the same time Munz sued the Defendant for $2.8 million dollars for the alleged unauthorized payments, including the 23 Munz signed personally. The government lowered the amount by $100,556.70 determined to be loans.

22. In transcripts from the civil case on March 19, 2007, the Plaintiff, Munz, and his counsel acknowledged that Redland had received two checks from the Defendant totaling $100,556.70 as repayment against loans the Defendant had received from Redland.

23. In these same transcripts, Munz's counsel, Lynette McGuinness, Esq., told the civil court that Munz never signed any checks to NGI Marine. During the same

proceeding, Munz testified under oath the he had never heard of NGI Marine nor ever authorized or signed any check to NGI Marine.

24.   Almost immediately after the March 19, 2007, civil proceeding, the United States Attorney's office amended their information against the Defendant to the new amount of $11,440,100.99. This fact is vitally important because it confirms the U.S. Attorney's Office was fully aware of everything happening in the civil matter and on information and belief the Assistant United States Attorney Joan Silverstein had been provided a transcript of the civil proceedings.

25.   At all relevant times hereto the United States, Redland, Munz, and respective counsel all had copies of all the checks made payable to NGI Marine, including 23 checks to NGI Marine written between November 29, 1997 and June 23, 1999, for a total of $1,275,237.72 which all bear the signature of Charles Pinky Munz.

26.   At the time Munz attorney, Lynette McGuinness, advised the Broward County Civil Court that Munz signed no checks to NGI Marine. She already had the Munz-signed checks and knew her statement to be false.

27.   From the very inception of their business dealings, and before the first check was ever written to NGI Marine (signed by Munz), Munz knew, agreed to, authorized and established the procedure by which the Defendant was legally paid $11,440,100.99.

28.   When Munz testified he did not know about the checks to NGI Marine and had never heard of NGI Marine, he knew his statements were deliberately false and he willfully perjured himself.

29.     Munz's counsel knew Munz was lying under oath and thereby suborned perjury in the civil matter.

30.     When the Defendant was arraigned in the United States District Court on Order in the criminal matter 1:07-CR-20415-JEM-1. June 5, 2007, Magistrate Judge Andrea M. Simonton executed the Standing Discovery

31.     The crux of the Government's case is that the Defendant embezzled over $11.4 million dollars from Redland without authorization.

32.     Redland's owner, Munz, claimed he never heard of Defendant's company NGI Marine and never authorized any checks to same.

33.     Any proof that Munz knew of, authorized, condoned, and participated in the payments by the Defendant to NGI Marine would cast a dark shadow of doubt over the Government's claims.

34.     The Government possessed checks to NGI Marine, signed by Munz, for $1,275,437.72, spanning a three year period.

35.     The existence of these checks prove Munz knew of and signed checks to NGI Marine and that Munz had lied to the U.S. Attorney's Office, the FBI Agents, and a Civil Circuit Court in Broward County, Florida.

36.     The United States failed to provide the evidence of the Munz-signed checks to the Defendant or defense counsel.

37.     In the plea agreement prepared by the Government at ¶ 57, the Government attempts to have Defendant, "waives the right to receive in discovery any such information and materials other than information and materials establishing the

factual innocence of the Defendant."   Clearly, the Government was still obligated to provide any evidence suggesting Defendant's actual innocence.

38.    If Charles Pinky Munz knew about and authorized the payments to NGI Marine under the terms set forth herein, then the Defendant is actually innocent of the allegations in the information.

39.    The existence of 23 checks, totaling $1,275,437.72, signed by Munz is a strong suggestion that Munz knew and authorized these payments.

40.    Defendant's counsel, Erle Ross Zimmerman, advised the Defendant that there were no checks signed by Munz, which was not true.

41.    Defendant's counsel, Erle Ross Zimmerman, advised the Defendant that no bank records exist after seven years, which was not true.

42.    If Defendant had known the Munz-signed checks could have been found, he would not have considered entering a guilty plea.

43.    (See also ¶ 9 supra).   During the period from 1994 to 2006 Munz authorized other companies controlled by certain Redland employees and made payments to them as a sub or vendor.   These were done in a similar manner and for the same reasons that Munz had for authorizing the payments to NGI Marine.

44.    Defendant retained Erle Ross Zimmerman to represent him in the potential criminal case as a result of the FBI search of his home.   Defendant retained him on February 10, 2007, and paid him $25,000.00.

45.    During Defendant's initial February 10, 2007 meeting, Defendant discussed the FBI search of February 8, 2007. Defendant discussed his employment with

Redland. His compensation, both on and off the records, and how such checks were made. He advised Defendant that he would be unable to obtain payment records back further than seven years.

46.    Defendant explained to Attorney Zimmerman that if he could not obtain the checks to prove Munz's knowledge and role in the payments that he might not be able to prove his innocence.

47.    Finally, in the first meeting Defendant explained he wanted him to contact the U.S. Attorney and find out what they had, or thought they had, against the Defendant. He finally explained that his primary goal in resolving the matter was to be absolutely sure that Defendant's wife could not/would not be in any way connected or charged.

48.    Defendant came away from the first meeting with Ross Zimmerman believing there was little hope getting his hands on the evidence that would clear him and feeling a real possibility Defendant might face things where he could not prove his innocence.

49.    During the week of February 15, 2007, the Defendant was named in a $2.8 million dollar civil suit brought by Redland against himself, his wife, his step-son, and Welling Construction, Inc., a business owned by Defendant's step-son, Robert C. Henning, III, and Defendant's wife, Martha G. Nowell.

50.    Zimmerman then advised Defendant's wife should seek a divorce to distance herself from Defendant in the criminal and civil matters. He prepared divorce papers and sent them to Mrs. Nowell's attorney, William Salim. On March 6, 2007, Defendant retained Zimmerman in the civil case.

14

51.     The Defendant met with Zimmerman again on February 27, 2007. He informed the Defendant of several conversations he had with AUSA Silverstein. At this meeting counsel advised Defendant that he should at least explore what kind of deal the Government might offer. Zimmerman further failed to discuss any evidence in the case, but told the Defendant the AUSA claimed to have over $11.5 million dollars in checks to Defendant's company, NGI Marine, Inc.

52.     On March 7, 2007, Zimmerman informed the Defendant he had a Kastigar letter, also sometimes called a "Queen for a Day" letter from the U.S. Attorney's office and advised Defendant the Government desired to meet with the Defendant concerning his potential cooperation with their investigation of Redland and Munz.

53.     On March 13, 2007, Zimmerman and the Defendant met with AUSA Silverstein, FBI Agent Koffee, FBI Agent Maria Lockwood, and a representative of the Miami-Dade County Corruption Unit. During this meeting Zimmerman gave Silverstein a copy of evidence of possible wrongdoing by Redland and owner Munz. There was no discussion of any evidence the AUSA had or might have regarding allegations against Defendant.

54.     On March 19, 2007, an Evidentiary Hearing was held in the "civil case" against Defendant, his wife and others. At this hearing Defendant's wife's counsel attempted to dissolve the writs, attachments, garnishments, and liens.

55.     Zimmerman would not allow the Defendant to participate in the hearing, and neither he nor anyone from his firm attended in Defendant's interest, even though Zimmerman was retained to represent Defendant in said matter.

56.    Transcripts of this March 19, 2007, meeting later revealed that Mr. Munz stated under oath he had never heard of NGI Marine.  Munz's attorney, Lynette McGuinness, stated Munz had never signed a check payable to NGI Marine and Redland's accountant testified that Defendant, Brad Nowell, had signed all the checks that comprised an exhibit marked as Exhibit "A".  It was later determined that Munz and his accountant lied under oath since 23 of the checks for over $1.2 million dollars were signed by Munz and were a part of the civil and criminal case.  Unfortunately, this remained unknown until mid-August, weeks after the June guilty plea.

57.    On April 20, 2007, Defendant met with Zimmerman and discussed the plea agreement proposed by the Government.  Zimmerman advised Defendant to accept the plea agreement because there was no way to prove Munz knew about the compensation plan and authorized the checks to NGI Marine.  Zimmerman had no information concerning any evidence the Government may or may not have had.  At this time Zimmerman had done no discovery of any kind.  He advised Defendant to enter a plea with no knowledge as to what the Government's case comprised.

58.    At the time the plea was being reviewed and discussed the Government had checks signed by Munz which prove he not only authorized the compensation plan, but actually issued the first two years of checks to the Defendant.  Had the Defendant known that the Munz-signed checks were available, the Defendant would never have agreed to plead guilty.

16

59.     On June 5, 2007, Defendant made his initial appearance, pled not guilty before Magistrate Judge Andrea M. Simonton. The Court issued a Standard Discovery Order.

60.     On June 6, 2007, Defendant was deposed by attorneys for Redland in the "civil case" against Defendant, his wife, and others.  While Defendant had retained Zimmerman in this case, Zimmerman sent Daniel Forrest to represent Defendant at the deposition. Attorney Forrest had no experience in this case.

61.     Zimmerman instructed Forrest to plead the 5th Amendment on questions asked of the Defendant concerning details in the criminal case.  Zimmerman further instructed Forrest to terminate the deposition at the end of two hours due to Defendant's health, even though Defendant expressed a desire to continue longer to help complete Plaintiff's questioning.

62.     At this deposition the checks undergirding the criminal case were there. Defendant's counsel, Mr. Forrest, was given the opportunity to review them, but acting on instructions from Zimmerman, Forrest did not review the checks and, instead, entered the 5th Amendment and instructed Defendant not to look at the checks.  Prudent review by Forrest or the Defendant would have discovered the Munz-signed checks and thereby derailed the criminal and civil cases by exposing Munz's lies.

63.     Discovery of the checks signed by Munz would have established that Munz and accountant Christie Sharp perjured themselves and Munz's attorney, Lynette McGuinness, had lied to the Court (though not under oath) and suborned perjury.

64.    On June 21, 2007, Defendant entered a change of plea before U.S. District Judge Jose E. Martinez. It should be noted that this change of plea was done just 16 days after the initial appearance and arraignment.

65.    From the date Zimmerman was retained on February 10, 2007, until the entry of the plea agreement, Attorney Zimmerman never reviewed a single piece of evidence or received any from the Government.

66.    The Government Agents, the Assistant United States Attorney, Munz's counsel, Lynette McGuinness, all knew that Munz wrote and authorized the first $1.2 million dollars paid under the aforementioned "off the books" plan.  None of these people disclosed said information even though it was relevant, exculpatory, and was causing a fundamental miscarriage of justice.

67.    Beginning on February 10, 2007, when Zimmerman was retained the Defendant explained his innocence. He always knew the first two years of payments were signed by Munz and that debunked his claims, yet knowing this, Zimmerman did nothing to find the checks or investigate the Defendant's claims. Attorney Zimmerman did no discovery of any kind.

68.    On August 17, 2007, a deposition of the Defendant was taken in the civil case. The Defendant was, for the first time, handed all the Redland checks to NGI Marine that formed the basis of the criminal case and the civil case.  Defendant was asked to review the checks. When he reached the bottom of the stack the 28 checks from Redland to NGI  Marine and signed by Munz totaling over $1.3 million dollars were found.

69.     On August 20, 2007, Defendant met with Zimmerman and inquired as to what could be done given the fact that the evidence that Munz had trumped up the criminal case and the Defendant was not guilty?

70.     Mr. Zimmerman answered: "We can't do anything – you have already pled guilty: - you can't change that!" The Defendant requested that Zimmerman more thoroughly check into the situation since there was also evidence of perjury by Munz and Munz's accountant and lawyer. The Defendant provided the transcripts of the perjury as well.

71.     From August 20, 2007 until August 31, 2007, the Defendant was unable to reach Zimmerman by phone. In frustration, Defendant prepared his own pro se Motion to Withdraw Guilty Plea and Motion to Dismiss Counsel and Request for New Appointed Counsel.

72.     At 4:30 p.m. Friday, August 31, 2007, Zimmerman agreed to meet with the Defendant. Zimmerman said; "I cannot do anything since he had failed to follow through on Discovery or locate the evidence that had been there all along."

73.     Defendant gave Zimmerman copies of the pro se motions discussed in ¶ 71 and advised he would be filing copies of same on Tuesday, September 4, 2007. Zimmerman never told Defendant that, under the rules of the Court, Defendant could not file pro se while represented by counsel.

74.     On September 4, 2007, the pro se Motions were filed and a hearing set for September 6, 2007. Judge Martinez denied the Motion to Change Plea and struck the Motion to Dismiss Counsel. The Court instructed Zimmerman he could re-file the

Motion to Change Plea if he wished and it would be heard on September 11, 2007, prior to sentencing.

75.     Zimmerman edited and re-typed Defendant's pro se Motion to Withdraw Plea and filed it. The only difference was he left out the portion about his failure to do discovery.

76.     Defendant retained Attorney Mark Nurik, Esquire, to argue the Motion to Withdraw Guilty which was ultimately denied.

77.     Defendant specifically requested Appellate Counsel to raise the issues of the Government's willful suppression of the exculpatory evidence and defense counsel's failure to seek and insure all discovery was reviewed before the final decision on pleading guilty was entered.

NOW THEREFORE the Defendant, Frederick Bradley Nowell, Sr., does hereby certify, swear, and affirm, under penalty of perjury pursuant to 18 USC § 1621, that the foregoing is true and complete to the best of my knowledge and ability and subscribe this Sworn Declaration on this 16th day of May 2008.

Further Affiant Saith Naught.

Frederick Bradley Nowell, Sr.
#79553-004  Antaeus
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512-4500

The foregoing was subscribed and sworn to before me on this _16th_ day of May 2008, by Frederick Bradley Nowell, who provided federal government photographic identification and/or is known to me personally.

_____
Notary Public, State at Large, Kentucky

My Commission Expires: __6/79/2010__

(Seal)

21

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

FILED BY _____ D.C.

2009 JUN 10 AM 9: 54

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.-FT. L.

FREDERICK BRADLEY NOWELL, SR.,

    Petitioner/Defendant,

    v.

UNITED STATES OF AMERICA,

    Respondent,

_____/

CV NO.: 08-23067-Civ-Martinez
CR NO.: 07-20415-CR-JEM

Hon. Jose E. Martinez
U.S. District Judge
Hon. Patrick White
U.S. Magistrate Judge

## PETITIONER'S MOTION FOR LEAVE TO AMEND BY SUPPLEMENT PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255 TO INCLUDE NEWLY DISCOVERED EVIDENCE WHICH EVIDENCE DIRECTLY BEARS ON THE ACTUAL INNOCENSE OF THE PETITIONER

    **COMES NOW**, the Petitioner , Frederick Bradley Nowell, Sr., pro se, and does move this

Honorable Court to give close consideration and grant leave for Petitioner To Amend by Supplement

Petitioner's Motion to Vacate, Set Aside or Amend Sentence Pursuant to 28 U.S.C. § 2255 to

include newly discovered evidence, highly relevant and exculpatory evidence made available for the

first time on May 27, 2009 which evidence directly bears on the actual innocense of the Petitioner,

and in support of this motion the Petitioner states as follows:

-1-

**APPENDIX ITEM #2**

## PRELIMINARY STATEMENT

The Defendant avers that he is not an attorney; has no legal or professional training pertaining to the preparation and filing of legal motions or memorandums. The Defendant seeks notice of such limitations and prays this Court to construe his pleadings liberally in light of the Supreme Court holding in *Haines v. Kerner*, 404 U.S. 519 (1972); *Cruz v. Beto*, 205 U.S. 319 (1972); *Hill v. United States*, 368 U.S. 424, 430 (1962). The allegations and averments in a pro se pleading must be taken and construed in favor of the defendant. *Tannenbaum v. U.S.*, 148 F.3d 1262-63 (11th Cir. 1998).

## PROCEDURAL HISTORY

The procedural history and statement of the case is fully set forth in Petitioner's original motion, the government's response and the Magistrate's Report and is adopted by reference herein.

## SUMMARIZED THEORY OF THE CRIME

1.      This case charges that the Defendant embezzled $11.4 million dollars from his employer, The Redland Company, Inc., over a period of nine years.

2.      The crime alleges that the Defendant committed this embezzlement by issuing 173 checks drawn on The Redland Company, Inc.'s. ( Redland) bank account payable to Defendant's corporation "NGI Marine".

3.      Redland's President and Sole Shareholder has claimed under oath that prior to discovering this massive theft he had never heard of NGI Marine, and never authorized a single payment to NGI Marine at anytime.   [ See Defendant's Objection to Report of Magistrate Judge page 36 and ( Cv-DE-29 ) ]

4.      To facilitate a Plea Agreement the Government created a charge of Mail Fraud alleging the filing by mail of NGI Marine's Annual Corporate Report as being essential to the crime.

## SUMMARIZED THEORY OF DEFENSE

5.      The Defendant steadfastly maintained that he and Munz had a separate compensation plan, separate and apart from Defendant's salary and that plan essentially agreed to pay Defendant 8% to 10% of gross revenues in exchange for Defendant's services.

6.      The overall defense has always simply boiled down to proving that Munz knew about and authorized the payments to the Defendant.  If the payments were known and authorized then there is no theft, no embezzlement, and no crime.

7.      The Defendant always maintained his innocense to family and friends, but pled guilty only because his counsel convinced him that he could not prove his innocense beyond a reasonable doubt.

8.      Within weeks of entering his plea the Defendant was confronted by 23 of the Redland checks written to NGI Marine and signed by Charles P. Munz.  The Government withheld these checks. Defendant attempted unsuccessfully to withdraw his guilty plea based on this evidence as a fair and just reason but was denied.

-3-

## DESCRIPTION OF NEW EVIDENCE

9.     The first piece of new evidence submitted hereto as Supp. Exhibit One is a letter from Redland's President and Sole Shareholder, Charles "Pinky" Munz to Redland's Accounting Firm, Conn & Sharp, P.A., dated March 27, 2007. This three page letter is presented in connection with Conn & Sharp's annual audit of Redland's Financial Statement. (This is seven ( 7 ) days after the Evidentiary Hearing in related civil matter, Cv-DE-29.)

10.     This letter is very crucial to Redland and has an impact on Redland's banking relationship, credit lines, bonds, and numerous other purposes. Any fraud, or mis-statement in this letter could have serious impact in other areas.

11.     Despite terminating Defendant on February 8, 2007, and claiming to have discovered the embezzlement in late 2006, Mr. Munz states:

> 7.     We have no knowledge of any fraud or suspected fraud affecting the company involving:
> a.     Management
> b.     Employees who have significant roles in internal control, or
> c.     Others where the fraud could have a material effect on the financial statements.
> 8.     We have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, or others.
> 16.     No events have occurred subsequent to the balance sheet date and through the date of this letter than is not already disclosed in the financial statements that would require adjustment to, or disclosure in, the financial statements.

[ Supp. Exhibit One, pages 2 & 3 ]

12.     According to documents filed in this case Munz and Redland had allegedly just discovered in late 2006 an $11.4 million dollar theft from the general fund account over a nine year

-4-

period, but there is nothing to note this in this audit letter. What is more telling is the fact this letter

states there was no knowledge of any "fraud" by anyone in the company at all. Clearly if this letter

is truthful; and for many reasons it must be, then this is written confirmation Redland was not the

victim of this crime and Munz's own letter proves it.

13.     If this evidence were not enough, at the same time Defendant received the hand

written working notes of Accountant Christi Sharp for the 2002 and 2003 audits. These hand written

audit notes are attached hereto as Supp. Exhibits Two and Three respectfully and by reference are

made a part hereof. These two exhibits further establish Munz's pre-existing knowledge of the NGI

Marine checks as written by Nowell and with Munz's full knowledge and authority comes the

establishment of Nowell's innocense.

14.     The first set of notes, Supp. Exhibit Two, concerns the 2002 Audit and these are

essentially the notes that Accountant Sharp made concerning items to discuss with Mr. Munz. One

of the notes states:

> "During test on insurance expense in GL account, check for
> T. R. Jones in the amount of $49,860.90 was cashed by Brad. He
> said he knew someone at the bank that would deposit in his account.
> Also that Pinky knew about it."

[Supp. Exhibit Two ¶ 2]

15.     This item is very important because this is the Redland check where the negotiable

copy was made payable to "NGI Marine" while the accounting copies were made to appear like the

check was made payable to T. R. Jones for insurance in the amount of $48,860.90. This was one of

the exact same types of checks made and printed in the exact manner as all the checks now alleged

to have caused the alleged theft.

16.     This document indicates that when the accountant found this she first addressed the Defendant who told her he had deposited the check into his account and Munz knew and approved of same.

17.     The document later indicates under comments that "Pinky did not know about the check to T. R. Jones, but had discussed it with Brad and it was going to be paid back".

18.     It is important that the Accountant fully explained to Munz how this transaction was discovered and that only by doing a fraud audit could other similar transactions be discovered. Munz did not request a fraud audit nor ask for the accountant to make further inquiries.

19.     Supp. Exhibit Two further contains two more comments from Sharp that were apparently suggestions concerning the Defendant.  These statements were:

> "Go over separation of duties, as Brad makes entries in computer in payables and receivables and Marilyn - (accounts payable/contract receivable) clerk."

> "Suggest Brad does not make entries in accounting portion of computer.  He should tell the person responsible for payables, or receivables what entries should be made so that one person will be able to reconcile."

[ Supp. Exhibit Two, ¶ ¶ 3, 4 ]

20.     While these two statements do not flatly accuse the Defendant they without question show that Sharp felt something was wrong and need precautions to be taken.

21.     Munz did not react to or agree with these notes and allowed matters to continue as they were with no changes.

22.     The final piece of new evidence, that has been discovered to date, is the 2003 Audit Notes for Redland by Sharp which is Supp. Exhibit Three.  The first paragraph states:

"During audit test, a check to Lace Construction dated 12/24/2003, CK#33796 did not have invoice. Requested Marilyn to call Lace Construction for copy of invoice. Marilyn asked Brad about it instead. He said he cashed it (deposited) in his bank account and C. P. Munz knew about it.
I told Pinky.
Pinky said he had no idea about the check. He said he would get with Brad. I told Pinky that a normal audit does not catch this type of transaction. & If he wanted me (the company) to do a fraud audit. He said not at this time, he was going to find out what happened. When I asked about what happened with Brad, C. P. Munz said that Brad produced a promissory note receivable and that he was going to pay back."

[ Supp. Exhibit Three, ¶ 1 ]

23.    For the second year in a row Ms. Sharp has presented the issue of a Redland check where the negotiable copy was made to NGI Marine and the accounting copies made out to Lace Construction. Just as in the previous year Munz stated the Defendant was paying it back and it was a loan.

24.    Just as in the previous year Ms. Sharp made some pointed suggestions:

"Brad should not have the ability to write checks, or enter invoices in the computer. There should be more separation of duties. At this time C. P. Munz said that would be hard to do."

"The Company should consider hiring a Comptroller with good accounting knowledge, to look over accounting functions, so that Brad would not be with day-to-day functions."

[ Supp. Exhibit Three ¶ ¶ 2 & 3 ]

25.    It should be noted that when the accountant suggested the Defendant not write checks Munz said, "that would be hard to do." This reply only makes sense in light of the compensation plan as the Defendant has explained it in his previously filed affidavit.

## SOURCE OF NEW EVIDENCE

26.     On May 27, 2009 Petitioner received, by mail copies of documents which are Exhibits from a deposition in which Petitioner gave testimony in the matter of *The Redland Company, Inc., v. Conn & Sharp, et. al.,* Case No. 08-3454-CA-27 in the Miami-Dade Circuit Court. They are provided by Attorney Leonard D. Blumenthal, Esq. While Petitioner had seen these documents briefly during his May 6, 2009 deposition, he did not have the documents in his physical possession until May 27, 2009 when they arrived by mail.

27.     Prior to May 6, 2009 Petitioner had no knowledge as to the existence of this evidence.

28.     Defendant's Objections to Magistrate's Report contains a reference to this new evidence on page 3, second full paragraph thru page 4, first paragraph.

## SUPPLEMENTAL ARGUMENT OF THE EVIDENCE

Throughout the Petitioner's lengthy § 2255 Motion he stresses over and over again that he did not commit this crime. He provides lengthy discussions and affidavits about his relationship with Redland and Munz and how he had a "separate and confidential compensation plan" that he and Munz attempted to hide from everyone including the accountant and other employees. There is no question that aspect of the story at first sound far fetched but in reality they are no more out of line than the stories Munz now tells over $11.4 million being secretly stolen from his business general funds for nine years with no notice. That is ever more far fetched itself.

Until now all Nowell had to assist his version of the facts were 23 checks ( which only became available to Defendant **after** guilty plea ) which Munz said he never heard of were signed

by Munz and made payable to NGI Marine. This directly contradicted some of Munz's own sworn and perjurious statements.

Now there exists a letter from Munz to the accountants for the very time period in which the Nowell's embezzlement and fraud scheme was allegedly discovered, in which Munz is certifying that there is not fraud associated with his company nor his employees.

This is no casual letter but rather a very important part of the audit and financial statement package of the Redland Company. This is also a document that carries huge potential damages for Munz and Redland which warrant comment.

Mr. Munz is a Director and Shareholder of the Community Bank of Homestead. This is also the bank where Redland does its business and where Redland maintains significant credit lines. All banks would require any customer like Redland to produce and maintain accurate and certified financial statements by a C. P. A. in order to maintain a credit line, especially one of $5,000,000.00 like Redland's. However, when a customer is also a director and shareholder of the bank there are even much more stringent rules that must be followed and submitting any kind of audited financial statement with any kind of misrepresentation would subject that person to a federal charge of bank fraud pursuant to 18 U. S. C. 1344 which carries a prison sentence of up to thirty years.

This is all said to stress just how important these auditing documents are to Munz and why they are the subject of such care and exact treatment. If a person like Munz were to disclose that there was no known fraudulent activity at Redland during the previous year and then it was shown that at that same time you were civilly suing and criminally prosecuting you vice president for an undisclosed $11.4 million dollar embezzlement it would appear that you were defrauding the bank on whose board you sit and thereby subject Munz to a prison sentence of his own.

Clearly these documents fortify and enforce everything that Nowell has stated and sworn to from the beginning. Every one must now give most serious consideration that Nowell is simply not guilty and just as Munz states in his Audit letter, there is no knowledge of fraud by anyone associated with Redland.

While these Exhibits prove that Munz had full knowledge of the NGI Marine transactions by 2002 and 2003 they also mean something else that is legally very important. These two checks that Munz instructed were to be loans were both paid off by Nowell and the amounts were deducted by the Government from its original loss amount. This could only have been done when the government fully understood the nature of these transactions and then the government would have required the appropriate documentation to justify the modification.

Simply put this becomes another instance where the government withheld evidence that it had to have. There is no way the government would have known how or why or how much to change the loss amount except by understanding these specific transaction and that would require the facts that these were checks that became loans, that were paid off, and that were lied about during other legal proceedings in which Munz swore under oath there were no loans between Redland and Nowell. Obviously this would indicate another *Brady* Violation.

More evidence of Nowell's innocence. This is exactly what this new evidence suggests and it does so in a manner that fits perfectly with everything that has been said or written about this case to date. Up until now the Court has resisted even granting an evidentiary hearing on any of these issues however, in the light of the new additional evidence it is becoming all the more essential that this court hold an evidentiary hearing and allow the Petitioner the opportunity to apply this evidence to the witnesses and once and for all demonstrate his complete innocense.

This case has been a frustration to the Government, the Court and especially the Defendant. It is one of those cases where anything that could go wrong did. The Defendant was improvidentially manipulated into entering a false plea to a crime he didn't commit. The Court then mistook Nowell's desire to withdraw his plea as someway to needlessly delay the proceedings, and finally the court for reasons not fully known simply predetermined that it would not consider withdrawing the plea and sentenced Nowell to a hefty sentence for a crime he didn't do.

While there has always existed evidence suggesting that Nowell was innocent, only now is more and more evidence surfacing that further supports Nowell's claims. When all is said and done

-10-

perhaps the greatest irony of all is that the only version of the facts of this case that matches with the evidence is every word that the Defendant set forth in his affidavit filed with the § 2255.

In conclusion, the Petitioner/Defendant wishes to restate his conclusion of Defendant's Objection To Magistrate's Report, and especially reiterate that; "The fact remains that justice can still be done. Nowell has served over 18 months in a federal prison because: ( 1 ) his lawyer was grossly ineffective in numerous areas of his representation; ( 2 ) his appellate lawyer continued the same pattern of ineffectiveness as shown in the issue he did not raise on appeal; ( 3 ) government's withholding of evidence favorable to the defense ( in violation of *Brady v. Maryland* ); ( 4 ) government and defense counsel deliberately ignored the Standing Discovery Order of June 5, 2007 to keep the Defendant from seeing the evidence that he had stated would cause him to proceed to trail; ( 5 ) Court's decision not to consider the withholding of evidence and perjury on the part of the alleged victim, along with the government's manipulation of the plea agreement as a "fair and just" reason for defendant's change of plea; ( 6 ) Court's invalid plea colloquy in not advising defendant of the consequences of the various waivers contained in the plea agreement.

Considering all of the above, both separately and collectively, [ and now combined with the additional newly discovered evidence ], Defendant's conviction should be declared invalid, and Defendant should be immediately released from the custody of the Federal Bureau of Prisons. In the alternative a full evidentiary hearing should be immediately held so evidence can be presented and witnesses can be heard on the issues raised by Petitioner/Movant/Defendant and the record thereby made complete and justice thereby can finally be done."

RESPECTFULLY submitted this _10th_ day of _June_, 2009.

Frederick B. Nowell, Sr.
Defendant Pro Se
#79553-004 Anteaus Unit
Federal Medical Center
P. O. Box 14500
Lexington, KY 40512-4500

## CERTIFICATE OF SERVICE

I, Frederick B. Nowell, Sr. do hereby certify that a true copy was provided to AUSA Joan

Silverstein, 99 N. E. 4th Street, Miami, FL 33132 - 2111 by depositing same into the United States

Postal Service; first class postage paid prepaid on the _10th_ day of _June_, 2009.

Frederick B. Nowell, Sr.
Defendant Pro Se
#79553-004 Anteaus Unit
Federal Medical Center
P. O. Box 14500
Lexington, KY 40512-4500

-12-

## PETITIONER'S MOTION FOR LEAVE TO AMEND BY SUPPLEMENT
## PETITIONER'S MOTION PURSUANT TO 28 U. S. C. § 2255
## NEWLY DISCOVERED EVIDENCE EXHIBITS

Supp. Exhibit One                    Redland Company, Inc.
                                     Accounting Letter of March 27, 2009


Supp.  Exhibit Two                   Conn & Sharp, P. A.  accounting notes for
                                     The Redland Company, Inc. For Audit Year 2002


Supp. Exhibit Three                  Conn & Sharp, P. A.  accounting notes for
                                     The Redland Company, Inc. for Audit Year 2003

The Redland Company, Inc.
23799 SW 162nd Avenue
Homestead, Fl. 33031

March 27, 2007

Conn & Sharp, P.A.
10 NE 18th Street
Homestead, Fl. 33030

We are providing this letter in connection with your audit of the balance sheets of The Redland Company, Inc. as of December 31, 2006, and the related statements of income and retained earnings, comprehensive income and cash flows for the years then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with U.S. generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material if they involved an omission or misstatement of accounting information that, in light of surrounding circumstances, make it probable that the judgement of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

We confirm, to the best of our knowledge and belief as of March 27, 2007 the following representations made to you during your audit.

1. The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2. We have made available to you all;

   a. Financial records and related data.

   b. Minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

3. There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

**SUPP. EXHIBIT ONE**
**PAGE 1 OF 3**

Conn & Sharp, P.A.
March 27, 2007
Page -2-

4.   There are no material transaction that have not been properly recorded in the accounting records underlying the financial statements.

5.   We believe the effects of any uncorrected financial statement misstatements are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

6.   We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7.   We have no knowledge of any fraud or suspected fraud affecting the company involving:

     a.   Management,

     b.   Employees who have significant roles in internal control, or

     c.   Others where the fraud could have a material effect on the financial statements.

8.   We have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, or others.

9.   The company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

10.  With regard to contracts completed during the year and in process as of December 31, 2006:

     a.   The lists of contracts completed during the year and in process as of December 31, 2006 represent a complete listing of all contract activity of the company, and there were no unauthorized or unrecorded uses of the company's assets on any projects during the year.

     b.   The company uses the percentage-of-completion method of recognizing income on all of our contracts in progress for financial reporting purposes. We believe this to be an acceptable method in accordance with the appropriate accounting literature. We believe that our estimates of costs to complete and extent of progress on all contracts in progress are reasonable and attainable.

     c.   Adequate provisions for losses have been provided on all loss contracts, if any.

     d.   There are no unapproved change orders, unrecorded claims, or contract postponements or cancellations as of the date of this letter.

**SUPP. EXHIBIT ONE**
**PAGE 2 OF 3**

Conn & Sharp, P.A.
March 27, 2007
Page -3-

11. The following have been properly recorded or disclosed in the financial statements:

    a. Related party transactions and related accounts receivable or payable, including sales, purchases, loans, transfers, leasing arrangements, and guarantees.

    b. Guarantees, whether written or oral, under which the company is contingently liable.

12. There are no;

    a. Violations or possible violations of laws or regulations whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

    b. Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Statement of Financial Accounting Standards No. 5.

    c. Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Statement of Financial Accounting Standards No. 5.

13. The company has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged except as made known to you.

14. We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

15. There are no estimates that may be subject to material change in the near term that have not been properly disclosed in the financial statements. We understand that near term means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the Company vulnerable to the risk of a near-term severe impact that have not been properly disclosed in the financial statements.

16. No events have occurred subsequent to the balance sheet date and through the date of this letter that is not already disclosed in the financial statements that would require adjustment to, or disclosure in, the financial statements.

Signed _____

Title _____4/14/07_____

**SUPP. EXHIBIT ONE**
**PAGE 3 OF 3**

For 2002 Audit - Meeting w/ Pinky Munz
- Go over draft of financial statements with Pinky, and work-in-process schedules + completed contracts.

✓ During test on insurance expense in GL account, check to T.R. Jones in the amount of $49,860.90 was cashed by Brad. He said he knew someone at his bank that would deposit in his account. Also that Pinky knew about it.

✓ Go over separation of duties, as Brad makes entries in computer in payables and receivables and Marilyn (accounts payable/contract receivable) clerk

Suggest Brad does not make entries in accounting portion of computer. He should tell the person responsible for payables, or receivables what entries should be made so that one person will be able to reconcile.

✓ Right now, the monthly reconciliation of banks and receivables are being reconciled. However, the payables and job costs appear to have no one looking at them for accuracy. Someone needs to look at on at least a monthly basis

Comments:
① Pinky did not know about check to T.R. Jones - I told him that I found it through one of my audit tests, and that I would not know if he did anymore unless I caught it in one of my tests. He said Brad was going to pay it back.
② Brad has to enter in computer to cover employees' absences + when they do not have time.

**SUPP. EXHIBIT TWO**
**PAGE 1 OF 1**

I bouch

Brad Nowell - Office Manager
Marilyn Liffe - Accounts payable, general ledger, bank reconciliations,
   Contract billings
Pat Hull - Payroll, lien releases, bank deposits
Tina Vosburgh - receptionist, hands out mail, invoice billings,
   Job tracker, files

Accounts payable are entered daily by Marilyn. The invoices have
been approved by appropriate personnel, ie Frank, the yard supervisor,
would approve parts, maintenance invoices, fuel. Brad Pinky or
a supervisor would approve job costs. Brad would approve
office expenses. Brad or marilyn runs the Accounts payable
listing where Brad will approve what payments to pay. Marilyn
runs the checks and gives them to Tina to match with invoices.
The checks with invoices are then given to Brad for either Pinky's
or Brad's signature. Tina files invoices with copy of check
in job file, if applicable or vendor file. A third copy of the
check is kept in numerical order in a binder.

In contract billing, James Eason will give Marilyn the amounts
on the ASP contract that have been completed. She enters in
the computer. For some jobs (especially County) she does not
post to the general ledger until the billing has been approved
by Customer, to avoid making too many changes.

Checks received are given to Pat Hull, she makes out deposit
slip & codes deposits (on slips) to job # or other. The bank
deposit is made by Pat + a copy of the deposit slip is
given to Marilyn for posting to A/R module, and make
necessary journal entries in general ledger for other
receipts such as insurance premiums reimbursement.

James Eason, Steve Leon handled most of the bidding
on new jobs. Pinky was involved with the approval of these
bids.

Marilyn prepared the monthly bank reconciliation,
reconciled balance sheet accounts with subsidiary ledgers.

**SUPP. EXHIBIT THREE**
**PAGE 2 OF 3**

Case 1:08-cv-23067-JEM   Document 31   Entered on FLSD Docket 06/10/2009   Page 20 of 20

and close out monthly general ledger. She also reconciled job costs to general ledger before closing out.

Financial statements are ran when Ricky request or Brad request one.

Porter 02085

**SUPP. EXHIBIT THREE**
**PAGE 3 OF 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.07-20415-CR-MARTINEZ

UNITED STATES OF AMERICA

          Plaintiff,

vs.

FREDERICK BRADLEY NOWELL, SR.

_____ Defendant.   /

## STANDING DISCOVERY ORDER

The above-named defendant(s) having been arraigned this date in open Court, it is thereupon

ORDERED and ADJUDGED that on or before fourteen (14) days from the date of this

Order, the parties shall confer and the following shall be accomplished:

A.    The government shall permit the defendant(s) to inspect and copy the following items or copies thereof, or supply copies thereof, which are within the possession, custody or control of the government, the existence of which is known or by the exercise of due diligence may become known to the government:

    1.    Written or recorded statements made by the defendant(s).

    2.    The substance of any oral statement made by the defendant(s) before or after his/her/their arrest(s) in response to interrogation by a then known-to-be government agent which the government intends to offer in evidence at trial.

    3.    Recorded grand jury testimony of the defendant(s) relating to the offenses charged.

    4.    The defendant's(s) arrest and conviction record(s).

    5.    Books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are material to the preparation of the defendant's defense, or which the government intends to use as evidence at trial to prove its case In chief, or which were obtained from or belonging to the defendant(s).

    6.    Results or reports of physical or mental examinations, and of scientific tests or experiments, made in connection with this case.

**APPENDIX ITEM #3**

B.   The defendant(s) shall permit the government to inspect and copy the following items, or copies thereof, or supply copies thereof, which are within the possession, custody or control of the defendant(s), the existence of which is known or by the exercise of due diligence may become known to the defendant(s):

   1.   Books, papers, documents, photographs or tangible objects which the defendant(s) intend(s) to introduce as evidence in chief at trial.

   2.   Any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case which the defendant(s) intend(s) to introduce as evidence in chief at trial, or which were prepared by a defense witness who will testify concerning the contents thereof.

   3.   If a defendant intends to rely upon the defense of insanity at the time of the alleged crime, or intends to introduce expert testimony relating to a mental disease, defect or other condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall give written notice thereof to the government.

C.   The government shall reveal to the defendant(s) and permit inspection and copying of all information and material known to the government which may be favorable to the defendant on the issues of guilt or punishment within the scope of Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976).

D.   The government shall disclose to the defendant(s) the existence and substance of any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective government witnesses, within the scope of Giglio v. United States, 405 U.S. 150 (1972) and Napue v. Illinois, 360 U.S. 264 (1959).

E.   The government shall supply the defendant(s) with a record of prior convictions of any alleged informant who will testify for the government at trial.

F.   The government shall state whether defendant(s) was/were identified in any lineup, showup, photospread or similar identification proceeding, and produce any pictures utilized or resulting therefrom.

G.   The government shall advise its agents and officers involved in this case to preserve all rough notes.

H.   The Government shall advise the defendant(s) of its intention to introduce extrinsic act evidence pursuant to Rule 404(b), Federal Rules of Evidence. The Government shall provide notice regardless of how it intends to use the extrinsic act evidence at trial, i.e. during its case-in-chief, for impeachment, or for possible rebuttal. Furthermore, the Government shall apprise the defense of the general nature of the evidence of the extrinsic acts.

I.   The government shall state whether the defendant(s) was/were an aggrieved person(s), as defined in Title 18, United States Code, Section 2510(11), of any electronic surveillance, and if so, shall set forth in detail the circumstances thereof.

J.    The government shall have transcribed the grand jury testimony of all witnesses who will testify for the government at the trial of this cause, preparatory to a timely motion for discovery.

K.    The government shall, upon request, deliver to any chemist selected by the defense, who is presently registered with the Attorney General in compliance with Title 21, United States Code, Sections 822 and 823, and 21 C.F.R., Chapter II, Part 1301, a sufficient representative sample of any alleged contraband which is the subject of this indictment, to allow independent chemical analysis of such sample.

L.    The government shall permit the defendant(s), his/her/their counsel and any experts selected by the defense to inspect any vehicle, vessel, or aircraft allegedly utilized in the commission of any offenses charged. Government counsel shall, if necessary, assist defense counsel in arranging such inspection at a reasonable time and place, by advising the government authority having custody of the thing to be inspected that such inspection has been ordered by the court.

M.    The government shall provide the defense, for independent expert examination, copies of all latent fingerprints or palm prints which have been identified by a government expert as those of the defendant(s).

N.    The government shall, upon request of the defendant(s), disclose to the defendant(s) a written summary of testimony the government reasonably expects to offer at trial under Rules 702, 703, or 705 of the Federal Rules of Evidence. This summary must describe the witnesses' opinions, the bases and the reasons therefor, and the witnesses' qualifications. If the defendant(s) seek(s) and obtain(s) discovery under this paragraph, the defendant(s) shall, upon request by the government, disclose to the government a written summary of testimony the defendant(s) reasonably expects to offer at trial under Rules 702, 703, or 705 of the Federal Rules of Evidence, describing the witnesses' opinions, the bases and the reasons therefor, and the witnesses' qualifications.

O.    The parties shall make every possible effort in good faith to stipulate to all facts or points of law the truth and existence of which is not contested and the early resolution of which will expedite the trial.

P.    The parties shall collaborate in preparation of a written statement to be signed by counsel for each side, generally describing all discovery material exchanged, and setting forth all stipulations entered into at the conference. No stipulations made by defense counsel at the conference shall be used against the defendant(s) unless the stipulations are reduced to writing and signed by the defendant(s) and his/her/their counsel. This statement, including any stipulations signed by the defendant(s) and his/her/their counsel, shall be filed with the Court within five (5) days following the conference.

Q.    Timing of all discovery shall be governed by the provisions set forth in paragraph Q of Local Rule 88.10.

It shall be the continuing duty of counsel for both sides to immediately reveal to opposing counsel all newly discovered information or other material within the scope of this Standing Order.

Upon a sufficient showing, the Court may at any time, upon motion properly filed, order that the discovery or inspection provided for by this Standing Order be denied, restricted or deferred, or make such other order as is appropriate. It is expected by the Court, however, that counsel for both sides shall make every good effort to comply with the letter and spirit of this Standing Order.

All motions concerning matters not covered by this Standing Order must be filed pursuant to Local Rule 88.9 within twenty-eight (28) days of this Order.

DONE and ORDERED at MIAMI, Florida this ___5TH_____ day of _JUNE__ 2007.


ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE


c:    All counsel of record

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

FREDERICK BRADLEY NOWELL, SR.,

      Movant/Defendant,


v.

              CV NO.:  08-23067-Civ-Martinez
              CR NO.:  07-20415-Cr-JEM
              Hon.  Jose E. Martinez
              U. S. District Judge
              Hon. Patrick White
              U. S. Magistrate Judge

UNITED STATES OF AMERICA,

      Respondent,

_____/



## MOTION FOR ORDER TO SHOW CAUSE WHY PROSECUTOR SHOULD NOT BE HELD IN CRIMINAL CONTEMPT OF THIS COURT

      COMES NOW the incarcerated Movant/Defendant, Frederick Bradley Nowell,

Sr., (hereinafter NOWELL)  pro se, and does  move this Honorable Court for an

Order To Show Cause Why Prosecutor Should Not Be Held In Criminal Contempt

Of This Court pursuant to prosecutor's misconduct as an officer of the court and

1

**APPENDIX ITEM #4**

disobedience of a lawful court order under 18 U. S. C. § 401 (2) and (3); and in

support NOWELL states the following:


## PRELIMINARY STATEMENT

NOWELL avers that he is not an attorney; has no legal or professional training

pertaining to the preparation and filing of legal motions, memorandums, and appeals.

NOWELL seeks notice of such limitations and prays this Court to construe his

pleadings liberally in light of the Supreme Court holding in *Haines v. Kerner*, 404

U. S. 519 ( 1972 ); *Cruz v. Beto*, 205 U. S. 319 ( 1972 ); *Hill v. United States*, 368

U. S. 424, 430 ( 1962 ).

Further NOWELL avers that his herein motion for relief may be construed as

a recharacterized motion or any other recharacterization deemed appropriate by the

Court in accordance with *United States v. Jordan*, 915 F.2d 622, 624-25 as quoted in

*O'Ryan Castro v. United States*, 290 F3d. 1270 (11th Cir. 2002) wherein:

> ". . . . courts have always had the power to recharacterize pro se
> petitioner's motions. In fact, due to the frequency in which pro se
> litigants draft incognizable motions, '[f]ederal courts have long
> recognized that they have an obligation to look behind the label of a
> motions filed by a pro se inmate and determine whether the motion is,
> in effect, cognizable under a different remedial statutory framework.'
> *United States v. Jordan*, 915 F.2d 622, 624-25 (11th Cir. 1990). The
> accommodation    was the result of the time-honored practice of
> construing pro se plaintiffs' pleadings liberally. See *Haines v. Kerner*,

2

Case 1:07-cr-20415-JEM   Document 53   Entered on FLSD Docket 04/11/2011   Page 95 of 120

Case 1:08-cv-23067-JEM   Document 86   Entered on FLSD Docket 06/22/2010   Page 10 of 21
Case 1:08-cv-23067-JEM   Document 83   Entered on FLSD Docket 06/08/2010   Page 3 of 14

404 U. S. 519, 520, 92 S.Ct 594, 30 L.Ed.2d 652 (1972) (per curiam)."

[*O'Ryan Castro v. United States*, 290 F.3d 1270 (11th Cir 2002]

Based on *United States v. Jordan*, supra and *Haines v. Kerner*, supra, NOWELL would ask that the Court construe his application for relief in the best light and most favorable characterization to this pro se litigant.

## RELEVANT STATEMENT OF THE CASE

The Redland Company, Inc. ("Redland") is an engineering construction company owned by Charles "Pinky" Munz ("Munz") (Cr-DE-13 ¶ 1 ). NOWELL was hired by Redland on or about September 1994 as an Administrative Vice-President with various duties, including the preparation of work estimates, the negotiation of contracts and subcontracts, and the approval of invoices and payments. (Cr-DE-13 ¶ 2 ). NOWELL was given signatory authority over Redland's operating account at Community Bank of Florida in Homestead, Florida on or about September 1999. (Cr-DE-13 ¶ 3 ).

In or around October 1992 NOWELL established The Nowell Group, Inc., a Florida Corporation, of which he was the President. NOWELL maintained a bank account at Bank of America, in the name of The Nowell Group, Inc., of which he was the signatory.

3

At the genesis of this case the FBI was conducting an investigation of Redland and on February 8, 2007, it executed a search warrant on NOWELL'S home. ( Cr-DE-24-1 ¶ 1 ). Shortly thereafter NOWELL began meeting and conferring with representatives of law enforcement and the United States Attorney's Office concerning the search warrant and the underlying investigation. ( Cr-DE-24-1 ¶ 2 ). During those meetings, the Government alerted NOWELL that it was conducting an investigation into NOWELL'S employer, Redland, and its owner, Charles "Pinky" Munz. ( Cr-DE-24-1 ¶ 2 ). The Government further advised NOWELL that based upon its ongoing investigation, on allegations of Charles "Pinky" Munz, owner of The Redland Company, it believed NOWELL had defrauded Redland out of substantial amounts of money. ( Cr-DE-24-1 ¶ 2 ).

NOWELL always adamantly denied the Government's accusations that he ever received any monies that were not known of, and authorized by Mr. Munz. ( Cr-DE-24-1 ¶ 2 ). From the very outset NOWELL explained that he and Munz had an agreement that included the payments and checks that the government later charged were the vehicle through which NOWELL was able to allegedly "embezzle" some $11.4 million dollars.

There are several very important facts that need to be established in order to understand this case: ( 1 ) NOWELL and Mr. Munz maintained an agreement from

Case 1:07-cr-20415-JEM   Document 53   Entered on FLSD Docket 04/11/2011   Page 97 of 120

Case 1:08-cv-23067-JEM   Document 86   Entered on FLSD Docket 06/22/2010   Page 12 of 21
Case 1:08-cv-23067-JEM   Document 83   Entered on FLSD Docket 06/08/2010   Page 5 of 14

about mid-1995 to his termination in which NOWELL would receive a modest salary and would further receive regular draws as payments toward his primary income which was to be 8% - 10% of Redland's gross revenue adjusted annually; ( 2 ) the additional income would be paid to Petitioner's personal corporation; ( 3 ) the payments would reflect on Redland's records as payments to vendors charged off as job costs, sub-contractors and suppliers; ( 4 ) this arrangement was supposed to be kept confidential from Redland's regular personnel. ( Cr-DE-18 ¶ 6 ) and ( Cr-DE-24 ¶ 11 ) and (Cv-DE-20).

These facts are central to this case because they deal directly with the payments that are not being charged against the Movant as the vehicle of embezzlement. There are 173 checks totaling $11,540,657.69. Of these one check is made payable to Yacht Equipment and Parts for $24,203.41 and one payable to Welling Construction for $148,884.42. The remaining 171 checks are all payable to NGI Marine which is NOWELL'S business. It has also been stipulated in a related civil case that check numbers 63 for $49,695.80 and number 85 for $49,860.90 were both undisputed loans from Redland to NOWELL that were repaid in full and were deducted from the original alleged loss amount after the government became aware of them. The inclusion of the Yacht Equipment and Welling Construction checks in the case makes the Information incorrect. The charging Information states that all the "illegal"

checks were deposited into NGI's bank account. These checks were not; making the information incorrect and further showing counsel's and government's misrepresentations. There is also the inclusion of the 23 checks signed by Munz in the charging information which again makes the information incorrect. [Munz, Munz's civil attorney and Munz's accountant all testified in the related civil case that Munz never signed any checks to NGI Marine.]

Of these 171 checks payable to NGI Marine, the first 23 checks to NGI Marine were signed by Charles P. Munz with the exception of one check which was signed by his wife Mrs. Terry Munz. These checks signed by Mr. and Mrs. Munz total $1,129,664.17. These are referred throughout all of NOWELL'S pleadings as the Munz signed checks.

Some jurists have apparently missed the importance of these checks. This entire criminal action and the related civil action; *The Redland Company, Inc. v. Nowell, et. al.*, Case No.: 07-003164 CACE ( 12 ), 17th Judicial Circuit in and for Broward County, Florida, ('the Civil Case"); center on the accusation that Frederick Bradley Nowell, Sr. embezzled $11,441,100.99 by writing checks to his company NGI Marine without the knowledge or authority of Mr. Munz who is the sole owner of Redland. This "fact" ( which is not true ), has been stated on the record on both the criminal and civil case wherein Charles Munz "never heard of NGI Marine" and

"never authorized any check to them." The real truth is; IF MR. MUNZ KNEW ABOUT AND AUTHORIZED THE NGI MARINE CHECKS THEN THERE WAS NO CRIME COMMITTED AND NO BASIS FOR THIS CRIMINAL ACTION.

This is the fact that apparently is not being considered and yet there are 23 checks signed by Munz for over $1.1 million dollars that prove Munz did know about and approved the payments for the first couple of years. (This had to be true because at the time of these first 23 payments Petitioner did not have any check signing authority and therefore Mr. Munz had to sign these 23 checks, and had to know about the transactions.) [1]

When NOWELL first learned the specifics of the accusations against him he immediately began requesting that his attorney obtain copies of all the checks that he was being accused of Mr. Nowell knew the Munz signed checks had existed because obviously NOWELL knew he was being paid before being able to sign checks so obviously those checks had to exist.

_____

[1]      At the risk of further confusing the issue there are also more Redland checks to NGI Marine written earlier than these and they were also obviously written and approved by Munz, however, since Redland and Munz did not see fit to include them in the evidence in this matter then there is no need to further address this issue except to note that Munz knew about and approved those payments as well because as stated above Nowell did not obtain signatory powers until several years into his agreement with Munz and Redland.

7

It was remarkable to NOWELL that no one had the checks or at least no one admitted having the checks.  The prosecutor, Ms. Silverstein, advised defense counsel, Erle Zimmerman, that there were no checks signed by Mr. Munz, further NOWELL signed al the checks himself.  If this statement is **not true** then one of two things had to be true;  ( 1 ) AUSA Silverstein lied to Zimmerman thus suppressed evidence in violation of *Brady* ; or ( 2 ) That Zimmerman never asked for evidence thus gross ineffectiveness of Counsel.  The F. B. I. Agent Maria Lockwood told NOWELL in the presence of NOWELL'S wife that all the checks were written by NOWELL and that Munz had no knowledge.  Here, if this statement **is true** then Agent Lockwood lied to NOWELL as the existence of 23 checks signed by Munz has now been established, ( Cv-DE-18-7 ), and were with Agent Lockwood during search of Defendant's residence on February 8, 2007, [See Cr-DE-35,  Hearing Transcript, Page 8, Line 8 thru 10].  In the civil case Munz testified he had never heard of NGI Marine until this case found it.  He testified he never authorized any payments to it.  At the hearings in the civil case Redland attorney McGuinness advised the Court that Munz had not signed "a single check" to NGI Marine. Redland's accountant Christi Sharp testified that all the checks had NOWELL'S signature on the back of the check (the endorsement), and testified that Mr. Munz did not sign any of the checks. [ It should be noted that the checks are endorsed by a

8

handwritten "NGI Marine" with the account number and they do not have any signature on the back. ] It has been clearly established that Munz signed at least 23 checks to NGI Marine so it is just as clear that misrepresentations were made and perjury was committed.   [ See Government's reply to 2255 Motion ( Cv-DE-18-7 ) and ( Cr-DE-18 and 24 ) Exhibits. ]

These facts are the truth and the evidence of this truth has been submitted to the Broward County Circuit Court, the United States District Court for the Southern District of Florida, the United States Court of Appeals for the Eleventh Circuit, and the Supreme Court of the United States and yet despite all of these presentations no one has commented on this most important evidence.

This then is the whole issue and is the crux of the fundamental miscarriage of justice that for some unexplained reason no court has yet to recognize. Redland and Munz state NOWELL stole over $11.4 million by writing checks to NGI Marine which, according to Munz he never authorized and never heard of until the discovery of the alleged theft.

After being coerced, lied to, and threatened into a plea of guilty; the <u>evidence</u> <u>surface</u> on August 17, 2007, nearly 2 months <u>after</u> NOWELL'S Change of Plea, of June 21, 2007, was entered, and 18 days <u>before</u> NOWELL'S Motion to Withdraw Guilty Plea based on "fair and just reason" argument.  That is just as NOWELL told

everyone; just as various affidavits from friends and associates forebear (Cv-DE-24, Exhibits);   NOWELL was truthful. (It should also be noted that from the date when the Munz signed checks became **"available"** to the Defendant till his Motion to Withdraw Guilty Plea was 18 days; During this 18 days Defendant was asking Attorney Zimmerman to withdraw the plea which he refused to do. )

On September 4, 2007, NOWELL filed his pro se Motion To Withdraw Previously Entered Guilty Plea, (Cr-DE-18): And on September 6, 2007, Judge Martinez denied NOWELL'S motion to withdraw his guilty plea.

On September 11, 2007, Judge Martinez again denied NOWELL'S Motion To Withdraw Guilty Plea filed by defense counsel, (Cr-DE-24).

Through counsel, NOWELL appealed the denial of his Motion To Withdraw Guilty Plea; Appellant's Counsel based appeal on only one issue, abuse of discression, failing to argue the issues instructed by NOWELL.

NOWELL'S appeal was denied on February 28, 2008; Writ of Certiorari was subsequently denied on October 21, 2008; and a 28 U. S. C. § 2255 Motion To Vacate was filed on November 3, 2008 (Cv-DE-1 and Cv-DE-2).

On March 23, 2010 an Order was entered adopting Magistrate Judge's Report and Recommendation and denial of NOWELL'S 28 U. S. C. § 2255 Motion, (Cv-DE-70); NOWELL filed an appeal on March 29, 2010 and on April 1, 2010 an Order was

entered by Judge Martinez denying a Certificate of Appealabilty, (Cv-DE-74).

March 29, 2010 Movant/Defendant NOWELL'S Application For Certificate Of Appealabilty was filed with the Eleventh Circuit Court of Appeals.

## BASIS FOR SHOW CAUSE ORDER

On June 5, 2007, Defendant NOWELL was charged by Information with one count of mail fraud and entered a plea of not guilty. Pursuant to Rules of Evidence and numerous case law findings such as *Brady v. Maryland*, 373 U. S. 83 (1963), NOWELL was due discovery favorable to his defense; Further, at this same time NOWELL entered his not guilty plea, the Court issued a Standing Discovery Order, dated June 5, 2007 and entered on the docket of this case on June 6, 2007.

As of the date of this filing, there has been no discovery of any type or kind accomplished   pursuant to *Brady* or any other case law ruling or finding or the Standing Discovery Order of June 5, 2007 that was to be accomplished by June 19, 2007 has never at anytime be accomplished.

Under 18 U. S. C. § 401 it states:

> "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as- -
> (1)    Misbehavior of any person in its presents or so near thereto as to obstruct the administration of justice;

11

   (2)    Misbehavior of any of its officers in their official transactions;

   (3)    Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

In *Irving Trust Co. v. Spruce Apartments, Inc.*, it was found:

"person having actual knowledge of existence of order or decree of court ws liable for violating it. . . ."

[*Irving Trust Co. v. Spruce Apratments, Inc.*, 44 F.2d 218 (1930 DE Pa.)]

In *United States v. Jones*, a case where allegations of material exculpatory information being withheld by prosecutor it was found:

"   In criminal contempt proceedings against Government prosecutors based on their alleged failure to provide defendants with all material exculpatory information, in violation of the Local Rules and court orders, if it is proven beyond a reasonable doubt that (1) there was lawful court order of reasonable specificity, (2) the prosecutor violated it and (3) the violation was willful, the prosecutor will have been proven guilty of criminal contempt. 18 U. S. C. A. § 401;"

[*United States v. Jones*, 620 F. Supp. 163 (D Mass. 2009)]

[See also; *United States v. Stevens*, Cr. No. 08-231 (EGS), 2009 WL 839337 (D. D. C. Apr. 1, 2009); *United States v. Shayan*, No. 08-20112-CR, WL 980289 (S. D. Fla., Apr. 9, 2009)]

The record in this case clearly shows that at no time was any evidence in the possession of the Government or that the Government had knowledge of or should have had knowledge of was provided to the defendant or his defense counsel in this

Case 1:07-cr-20415-JEM   Document 53   Entered on FLSD Docket 04/11/2011   Page 105 of 120

Case 1:08-cv-23067-JEM   Document 86   Entered on FLSD Docket 06/22/2010   Page 20 of 21
Case 1:08-cv-23067-JEM   Document 83   Entered on FLSD Docket 06/08/2010   Page 13 of 14

case. This undisputable fact of the Government's failure to provide discovery prescribed by law and rule is a direct violation of 18 U. S. C. § 401 (2) "Misbehavior of any of its officers in their official transactions;" and further the Government's failure to obey a lawful Standing Discovery Order withing the prescribed time set by said order is a direct violation of 18 U. S. C. § 401 (3) "Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

NOW THEREFORE based on the foregoing facts and law, Movant/Defendant NOWELL prays this Honorable Court to order that the AUSA Joan Silverstein show cause why she should not be held in criminal contempt of this court for the violation of Rules of Evidence, case law and 18 U. S. C. § 401 (2) and (3); and if the Court cannot determine in the premises that a violation occurred then NOWELL prays this Court to convene an evidentiary hearing to determine such violation by AUSA Joan Silverstein did occur.

Respectfully submitted,

Frederick Bradley Nowell, Sr.
Movant/Defendant, pro se
#79553-004, Anteaus Unit
Federal Medical Center
P. O. Box 14500
Lexington, KY 40512

13

## CERTIFICATE OF SERVICE

I, Frederick Bradley Nowell, Sr., hereby certify that a true copy of the forgoing was mail to the parties shown on the <u>SERVICE LIST</u> below on this $7\frac{th}{}$ day of __June__, 2010, by depositing in the U. S. Mail, postage prepaid.

_____
Frederick Bradley Nowell, Sr.

### SERVICE LIST

R. Alexander Acosta, Esq.
United States Attorney
United States Attorney's Office
99 N. E. 4th Street
Miami, Florida

Joan Silverstein, Esq.
Assistant United States Attorney
United States Attorney's Office
99 N. E. 4th Street
Miami, Florida 33132

14

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

FREDERICK BRADLEY NOWELL, SR.,

      Movant/Petitioner/Defendant,

v.

                            CV NO.:  08-23067-Civ-Martinez
                            CR NO.:  07-20415-Cr-JEM
                            APPEAL NO.:  10-11444-G
                            Hon.  Jose E. Martinez
                            U. S. District Judge
                            Hon. Patrick White
                            U. S. Magistrate Judge

UNITED STATES OF AMERICA,

      Respondent,

_____/

## MOTION FOR THE DISQUALIFICATION OF
## ASSISTANT UNITED STATES ATTORNEY

    COMES NOW the Movant, Frederick Bradley Nowell, Sr., (hereinafter NOWELL) pro se, and does move this Honorable Court for the disqualification of Assistant United States Attorney, Joan Silverstein, (hereinafter SILVERSTEIN), pursuant to 28 U. S. C. § 528; and in support does state the following:

1

**APPENDIX ITEM #5**

## PRELIMINARY STATEMENT

NOWELL avers that he is not an attorney; has no legal or professional training pertaining to the preparation and filing of legal motions, memorandums, and appeals. NOWELL seeks notice of such limitations and prays this Court to construe his pleadings liberally in light of the Supreme Court holding in *Haines v. Kerner*, 404 U. S. 519 ( 1972 ); *Cruz v. Beto*, 205 U. S. 319 ( 1972 ); *Hill v. United States*, 368 U. S. 424, 430 ( 1962 ).

Further NOWELL avers that his herein motion for relief may be construed as a recharacterized motion or any other recharacterization deemed appropriate by the Court in accordance with *United States v. Jordan*, 915 F.2d 622, 624-25 as quoted in *O'Ryan Castro v. United States*, 290 F3d. 1270 (11th Cir. 2002) wherein:

> ". . . . courts have always had the power to recharacterize pro se petitioner's motions. In fact, due to the frequency in which pro se litigants draft incognizable motions, '[f]ederal courts have long recognized that they have an obligation to look behind the label of a motions filed by a pro se inmate and determine whether the motion is, in effect, cognizable under a different remedial statutory framework.' *United States v. Jordan*, 915 F.2d 622, 624-25 (11th Cir. 1990). The accommodation  was the result of the time-honored practice of construing pro se plaintiffs' pleadings liberally. See *Haines v. Kerner*, 404 U. S. 519, 520, 92 S.Ct 594, 30 L.Ed.2d 652 (1972) (per curiam)."

[*O'Ryan Castro v. United States*, 290 F.3d 1270 (11th Cir 2002]

Based on *United States v. Jordan*, supra and *Haines v. Kerner*, supra, NOWELL

would ask that the Court construe his application for relief in the best light and most favorable characterization to this pro se litigant.

## BASIS FOR DISQUALIFICATION

Pursuant to 28 U. SS. C. § 528 it states:

"The Attorney General **shall** promulgate rules and regulation which require the disqualification of any officer or employee of the Department of Justice, including a United State Attorney or a member of such attorney's staff, from participation in a particular investigation or prosecution **if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof.** Such rules and regulations may provide that a willful violation of any provision thereof shall result in removal from office." [Emphasis added]

It has been found that a trial court has the power to disqualify or recuse a prosecuting attorney from proceeding with a particular criminal prosecution if it determines that the prosecuting attorney suffers from a conflict of interest which might prejudice him or her against the accused, as where he or she has a **personal interest** in convicting the accused, or where he or she has a **pecuniary interest** in the outcome.

## REASONS FOR DISQUALIFICATION

The geneses of this case was the serving of a search warrant on NOWELL'S

3

residence on February 8, 2007. Following that event there was discussions with the AUSA SILVERSTEIN by both NOWELL and his Defense Counsel, E. Ross Zimmerman, concerning allegations by Charles "Pinky" Munz, (hereinafter MUNZ), the President and Sole Shareholder of The Redland Company, Inc., (hereinafter REDLAND), that NOWELL embezzled/stole/converted REDLAND funds for his personal use. MUNZ alleges that he did not authorize nor know about these funds being taken by NOWELL.

During the time that the criminal investigation, plea agreement negotiations, and sentencing was ongoing, MUNZ retained the service of Akerman Senterfitt, Attorneys At Law, One Southeast Third Avenue, 25th Floor, Miami, Florida 33131-1714. Akerman Senterfitt represented REDLAND and MUNZ concerning the violation of the Miami-Dade County Building Codes in the additions and construction improvements to the REDLAND corporate offices, property owned by MUNZ. Akerman Senterfitt representation commenced sometime prior to April 30, 2007 as evidenced by the hereto attached letter, Exhibit #1, and by reference is made a part of this record. This representation of MUNZ and REDLAND by Akerman Senterfitt continued until at least June 4, 2007, as evidenced by the hereto attached letter, Exhibit #2, and by reference is made a part of this record.

NOWELL states that he is unaware of the amount of fees paid by REDLAND

4

and MUNZ to Akerman Senterfitt for the representation before the Miami-Dade County Building Department; but believes these fees to be substantial based on the complexity of the code violations by MUNZ and REDLAND.

Nowell states he is unaware of whether Akerman Senterfitt still represents REDLAND and MUNZ; but does state that Akerman Senterfitt did represent MUNZ and REDLAND during the period of time from the early part of the investigation, plea negotiations and sentencing in this instant case wherein SILVERSTEIN was the prosecutor for the government.

It has only recently become known to NOWELL that the AUSA SILVERSTEIN'S spouse, David S. Gerber, is a member of the Akerman Senterfitt firm and believes that Mr. Gerber derives a considerable income from being a member of said firm.

NOWELL believes, alleges, and states that the AUSA SILVERSTEIN receives substantial financial benefit from the income of her spouse, Daniel S. Gerber, from the income he receives from the fees that are paid to the firm that he is a member of.

NOWELL believes and states that AUSA SILVERSTEIN had a direct financial conflict of interest in prosecuting a case wherein the alleged victim was paying fees to the very firm that she derived financial gain from through her own husband; 28 U. S. C. § 528 states in part; ". . . participation may result in personal **financial**, or

5

political conflict of interest, <u>or the appearance thereof</u>." {Emphasis added]

NOWELL states and believes that AUSA SILVERSTEIN had a personal conflict of interest in that she needed to achieve a conviction to assist MUNZ, through her spouse's firm, in discrediting NOWELL to further the prosecution and benefit MUNZ in other legal matters relating to NOWELL; 28 U. S. C. 528 states in part; ". . . participation may result in <u>personal</u>, financial, or political conflict of interest, <u>or the appearance thereof</u>." [Emphasis add]

NOWELL has filed a collateral attack of his conviction, buy means of a plea agreement, and his sentence pursuant to 28 U. S. C. § 2255 Motion, (Cv-DE-1) and a supporting Memorandum of Law, (Cv-DE-2), wherein there is extensive argument as to AUSA SILVERSTEIN'S failures in prosecuting this case; These failures by SILVERSTEIN, now in light of the personal and financial conflicts with the alleged victim, bring about the greater probability of merit in NOWELL'S allegation of prosecutional misconduct in her prosecution of this case.

## MOTION TO HOLD EVIDENTIARY HEARING

This cause coming on for consideration by the Court upon the herein Motion For The Disqualification of Assistant United States Attorney and after review of said motion, the file, and the Court having been fully advised in the premises the

6

Movant/Defendant NOWELL further moves this Court for the convening of an evidentiary hearing to fully resolve all issues of this herein action.

NOWELL believes and states that if the Court can not find that (1) there is a conflict of interest; (2) that the conflict is so severe as to disqualify the prosecuting Assistant United States Attorney, Joan SILVERSTEIN, from any further actions in this case; That the Court must hold an evidentiary hearing to determine these matters. Dismissal of a post-conviction petition without an evidentiary hearing would be error.

NOWELL avers that SILVERSTEIN had a personal conflict of interest in that she knew or should have known that her spouse, Daniel S. Gerber's law firm Akerman Senterfitt was closely working with MUNZ in their representation of MUNZ and REDLAND, the alleged victims in this case, during the time of her prosecution of NOWELL wherein NOWELL'S conviction was paramount in Akerman Senterfitt's successful representation of MUNZ and REDLAND before the Miami-Dade County Building Department.

Further, NOWELL avers that SILVERSTEIN had a financial conflict of interest in that her spouse's income was impart derived from the fees paid to Akerman Senterfitt by its clients, MUNZ and REDLAND; having a direct effect on the financial benefit of SILVERSTEIN from said income of her spouse.

NOWELL states and believes that he has presented to the Court sufficient

7

documentation to show an attorney-client relationship between MUNZ, REDLAND

and Akerman Senterfitt law firm of which SILVERSTEIN'S spouse is a member of;

NOWELL believes that SILVERSTEIN Spouse derives considerable income from

said law firm which inturn has a direct effect on the financial gain of SILVERSTEIN.

NOWELL states and believes that the prosecution was directly affected by the

personal and financial conflict that SILVERSTEIN was conflicted with and as such

was greatly influencing the manner in which SILVERSTEIN prosecuted this case.

NOWELL states and believes that at the very least there is, ". . . . the

appearance thereof." ( 28 U. S. C. § 528), of a conflict of interest in this matter that

has severely conflicted the prosecutor in this case, and the Court needing additional

evidence and documentation must convene an evidentiary hearing to resolve and

determine these matters.


## CONCLUSION

Movant/Defendant NOWELL has attempted to put before this Court sufficient

information to sustain a finding that there was and is a conflict of interest in this

matter on the part of the Assistant United States Attorney, Joan SILVERSTEIN; and

further stated in his belief that if the Court could not reach a finding of a violation of

28 U. S. C. § 528, that the Court must hold an evidentiary hearing so additional

## CERTIFICATE OF SERVICE

I, Frederick Bradley Nowell, Sr., hereby certify that a true copy of the forgoing

was mail to the parties shown on the <u>SERVICE LIST</u> below on this 17th day of

M̲a̲y̲_____, 2010, by depositing in the U. S. Mail, postage prepaid.

Frederick Bradley Nowell, Sr.

## SERVICE LIST

R. Alexander Acosta, Esq.
United States Attorney
United States Attorney's Office
99 N. E. 4th Street
Miami, Florida

Joan Silverstein, Esq.
Assistant United States Attorney
United States Attorney's Office
99 N. E. 4th Street
Miami, Florida 33132

10

information can be subpoenaed and witnesses' testimony taken to show the truth of the allegations in this herein motion for evidentiary hearing.

NOW THEREFORE Movant/Defendant NOWELL prays that this Honorable Court will order the disqualification and recusal of Assistant United States Attorney, Joan SILVERSTEIN for the reasons herein stated from any further matters of and prosecution of this case; or the convening of an evidentiary hearing to put on further evidence and take testimony of witnesses as to the allegations in this matter; and any other relief deemed appropriate by this Honorable Court.

Respectfully submitted,

Frederick Bradley Nowell, Sr.
Movant/Defendant, pro se
#79553-004, Anteaus Unit
Federal Medical Center
P. O. Box 14500
Lexington, KY 40512

9

JUN-04-2007  14:57                                                      P.003



Fort Lauderdale
Jacksonville
Los Angeles
Madison
Miami
New York
Orlando
Tallahassee
Tampa
Tysons Corner
Washington, DC
West Palm Beach

One Southeast Third Avenue
25th Floor
Miami, Florida 33131-1714
www.akerman.com
305 374 5600 tel   305 374 5095 fax

April 30, 2007

**VIA FACSIMILE & U.S. MAIL**

Mr. Monte Lee
Field Unit Supervisor
Miami-Dade County
Building Department
11805 S.W. 26th Street
Room 230
Miami, FL 33175

Re:   Case No. 2007 0 108223 / Property Located at 23799 S.W. 167th Avenue /
      Folio No. 30-6920-003-0011

Dear Mr. Lee:

As you know, I have been retained by Mr. Munz to counsel him regarding any possible violations of the County's Building Code on his property located at 23799 S.W. 167th Avenue. In response to your correspondence of April 4, 2007, attached hereto, I am respectfully requesting additional time within which to address the matter for the following reasons:

1)      First, as you know under Florida Statutes, Section 604.50, non-residential farm buildings are exempt from the Florida Building Code and we are in the process of determining whether the structures on his property qualify for such exemptions.

2)      Second, Mr. Munz has also retained Mr. Edward Ashley to study the feasibility of obtaining after-the-fact permits for those structures that may not be exempted under Florida Statutes, Section 604.50.

Accordingly, since Mr. Munz is diligently seeking an appropriate solution to the issues you have identified, I respectfully request additional time to June 5, 2007 within which to address your April 4, 2007 correspondence.

**Exhibit 1**
**Page 1 of 3**

{M2540522;1}

06/04/2007 MON 14:13

JUN-04-2007  14:57                                          P.004

Mr. Monte Leo
April 30, 2007
Page 2

Please feel free to contact me if you have any questions.

Very truly yours,

Augusto E. Maxwell

AEM/bf
Enclosure

**Exhibit 1**
**Page 2 of 3**





**Miami-Dade County Building Department**
Building Support Section
11805 S.W. 26 Street (Coral Way), Room 230
Miami, FL 33175-2474
T 786 315-2424 F 786 315-2912

miamidade.gov

5/2/2007

CHARLES P MUNZ

23799 SW 162 AVE
HOMESTEAD FL 330311309

Re: Case Number - 20070108223

Violation Address: 23799 SW 167 AVE

This is in response to your request for an extension of time to comply with the requirements for correction specified in the Notice of Violation issued to you regarding Building Code violations on the property located at 23799 SW 167 AVE.

The Building Department is granting you an extension until 6/4/2007 to correct all violations. Failure to comply will result in the issuance of a Civil Violation Notice without further notice to you.

In the event you need further assistance, please contact the inspector assigned to your case.

Thank you for your cooperation in this matter.

Juan Valle
Building Inspector

**Exhibit 1**
**Page 3 of 3**

JUN-04-2007  14:57                                                      P.002   *E*



**Akerman**Senterfitt
ATTORNEYS AT LAW

Fort Lauderdale
Jacksonville
Los Angeles
Madison
Miami
New York
Orlando
Tallahassee
Tampa
Tysons Corner
Washington, DC
West Palm Beach

One Southeast Third Avenue
25th Floor
Miami, Florida 33131-1714
www.akerman.com
305 374 5600 tel   305 374 5095 fax

June 4, 2007

**VIA FACSIMILE & U.S. MAIL**

Mr. Monte Lee
Field Unit Supervisor
Miami-Dade County Building Department
11805 S.W. 26th Street, Room 230
Miami, Florida 33175

Re: Case No. 20070108223 / Property Located at 23799 S.W. 167th Avenue / Folio No. 30-6920-003-0011

Dear Mr. Lee:

As indicated in my letter of April 30, 2007, I am writing to address the issues raised by your notice of April 4, 2007 alleging that certain building improvements were made without obtaining a required building permit.

As you know, under Florida Statutes Sec. 604.50, non-residential farm buildings are exempt from the Florida Building Code. My research indicates that there appears to be no legal authority on point that contemplates situations like ours where non-residential buildings serve both farm and non-farm uses.

Accordingly, I would respectfully request a meeting with appropriate Department staff to ascertain whether the Department has already addressed such mixed use structures on farm lands, and how such possible precedents may affect our situation.

Sincerely,

Augusto E. Maxwell

AEM/dp

cc:   Mr. Charles Munz
      Mr. Ricardo Roig

{M2557568;1}

08/04/2007 MON 14:13  [TX/RX NO 7570]  @002

**Exhibit 2**
**Page 1 of 1**

